FILED

2012 Jul-25  PM 04:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT** | ) | |
| **OPPORTUNITY COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NUMBER:** |
| **v.** | ) | **2:10-cv-02627-WMA** |
| | ) | |
| | ) | |
| **THE MCPHERSON COMPANIES ,** | ) | |
| **INC.** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## PLAINTIFF'S BRIEF IN RESPONSE
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I.       **INTRODUCTION**

Plaintiff Equal Employment Opportunity Commission ["Plaintiff," "EEOC," or the "Commission"] responds to Defendant McPherson Companies, Inc.'s Motion for Summary Judgment and Defendant's Brief in Support of Motion. ["Defendant" or McPherson" and "Defendant's Motion" and/or "Brief"]. Defendant's Motion addresses the Commission's two claims in issue.

The Commission commenced this action under its statutory authority to initiate cases to enforce the provisions of Title VII of the Civil Rights Act of 1964, as amended. The Commission filed this case on behalf of the public interest and John Doe ("Doe")[1], the Charging Party, alleging Defendant violated Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. Sections 2000e *et seq*. and the Civil Rights Act of 1991, 42 U.S.C. Section 1981a ("Title VII").  The Commission asserts two claims: (1) unlawful sex discrimination in violation of Section 703 of Title VII, 42 U.S.C. Section 2000e-2(a)(1)(2); and (2) unlawful retaliation against Doe for Doe's opposition to discrimination, including but not limited to his discharge from employment, in violation of  Section 704 of Title VII, 42 U.S.C. Section 2000e-3(a).

Plaintiff's first claim alleges Defendant violated Title VII by subjecting Doe to a: (1) hostile work environment based on sex; and/or (2) a hostile work environment based on unlawful gender stereotyping. Defendant's supervisors subjected Doe to: (a) an unlawful hostile work environment based on sex; and (b) unlawful gender harassment treatment by treatment motivated by their conclusion that Doe's behavior did not comport with the male gender role. Plaintiff's second claim alleges Defendant violated Title VII by engaging in unlawful retaliation against Doe for engaging in Title VII protected opposition to discrimination.

---

[1] In the lawsuit, Charging Party is referenced as "John Doe."

RELATED PROCEEDING

Plaintiff has filed an affirmative summary judgment motion in this proceeding. The arguments, facts and exhibits included with that court filing are incorporated by reference as part of this filing as if copied and restated herein in their entirety.

**II.   ARGUMENT**

**1.   Sufficient Evidence of Hostile Work Environment Based on Sex Claim**

    **A.   Overview**

Plaintiff presents sufficient undisputed facts combined with   substantial genuine disputed issues of material fact that make summary judgment inappropriate in this proceeding. The undisputed facts alone establish a prima facie case of hostile work environment based on sex. Title VII prohibits an employer from discriminating against an individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

Sexual harassment in the form of a hostile work environment constitutes sex discrimination. *Meritor Save. Bank, FSB v. Vinson,* 477 U.S. 57, 64 (1986). Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter

the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).   This protection against discriminatory treatment because of sex is not limited to harassment perpetrated by a member of the opposite sex. *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 79-80 (1998).   Furthermore, deciding a hostile work environment case "is not, and by its nature cannot be, a mathematically precise test." *Harris,* supra, 510 U.S. at 22. "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

### B.      Plaintiff's Claim: Hostile Work Environment by Supervisors

When harassment against a supervisor is alleged, it is important to determine the hierarchy of supervision.  In this case, Doe reported directly to Lamar Tipton, his first level supervisor.[2] Tipton reported to Mike McPherson, Assistant Operations Manager ("Mike"). Mike reported to Randy Painter, Facility Operations Manager.[3] Painter reported to Mike Bedford, Vice President of

---

[2]  Ex. 6  [Dep. (Tipton)  20:4-9]
[3]  Ex. 7  [Dep. (Mike)  13:19-14:16; 15:22-16:1-9]

Operations.[4] [5] Tipton, Mike, and Painter worked in the warehouse with Doe and held higher positions of authority than Doe and had the ability to direct Doe to perform certain duties.[6]  Tipton had daily contact with Doe.[7] Tipton had the authority to issue disciplinary actions against Doe.[8] Mike and Painter had the authority to: (a) take disciplinary action against Doe; and (b) direct Tipton to take disciplinary action against Doe.[9] [10]

Mike and Painter targeted Doe for harassment. "**Mike and Painter called [Doe] offensive and degrading names in a harassing manner; over a long period of time; way beyond the point of a joke or locker room talk.[11]**" [Emphasis supplied].

Doe did not engage in reciprocal sexual name calling or harassment against his harassers.

Mike and/or Painter, Defendant's managers, relentless and continually verbally harassed Doe by stating to him, referring to him, and/or taking the actions against him, as set forth in Defendant's 25 Comments/Actions[12]:

      (1)      You act and walk like a woman or girl;

---

[4]  Ex. 4  [Dep. (Bedford)  9:12-10]
[5]  Ex. 3  [30(b)(6) Dep. (Chapman) 30:2-6]
[6]  Ex. 3  [30(b)(6) Dep. (Chapman) 31:20-23; 32:1-3]
[7]  Ex. 6  [Dep. (Tipton)  44:17-20]
[8]  Ex. 6  [Dep. (Tipton)  58:6-12]
[9]  Ex. 7  [Dep. (Mike) 15:19-16:3]
[10] Ex. 8  [Dep. (Painter) 18:10-20]
[11] Ex. 13 [Declaration of Nathaniel Shane Blackmon, para. 9 ]
[12] Ex 10  [Plaintiff's Rule 30(6) Notice of Deposition to Defendat, p.  , para.]

5

(2)        You are feminine;

(3)        If you just change how you carry yourself, you will not have
           this   problem;

(4)        If you would just act more like us; watch football, go hunting;
           you would not have this not have these problems (being called
           such offensive names and treated in the manner in which he
           was treated);

(5)        Placing a deer's testicles and two chopped-off deer legs; on
           Charging Party's work desk, which was covered in the blood
           from the animal parts;

(6)        Whistling at Charging Party, in the offensive manner that a man
           may whistle at a female;

(7)        Fag;

(8)        Faggot;

(9)        Fairy;

(10)       Fag-Fairy;

(11)       Queer;

(12)       Ass-breath;

(13)       Dick-sucker;

(14)       Homo;

(15)       Gay-Boy;

(16)       Dick-Sucking-Queer;

(17)       Mother-fucking-Queer;

(18)       You are just like a Fag Fairy Puff;

(19)     You have had plenty of nuts in your mouth before;

(20)     Anyone who pulls their pants down and you are ready to start sucking them off; combined with a demonstration by McPherson of how Doe's would allegedly move; to-wit: bobbing on a person's penis.

(21)     Everyone needed to pull up their pants because the fag-fairy (Doe) was present;

(22)     Did the battery go dead on your butt plug?

(23)     Doe's not worth a damn unless his ass was vibrating;

(24)     I will take you behind a tank and have sex with you; and

(25)     Bitch.[13]

This list of sexually offensive comments to Doe from Mike and Painter is not exhaustive. Defendant admits Mike and Painter made additional sexually offensive comments to Doe.  All of the comments and actions of Mike and Painter against Doe were sexual comments and sexual actions. Mike and Painter targeted no employee other than Doe for such treatment. Moreover, Defendant found that Tipton, Mike, and Painter had engaged in **unlawful discrimination** against Doe. Defendant issued the lowest possible form of discipline to these supervisors/managers, an unwritten verbal counseling. Tipton, Mike, and Painter were not suspended, discharged, or subjected to a reduction in force.  Plaintiff's

---

[13] Ex. 5 [Doe Dep. 358:4-18] [Doe testified concerning the 25 Statements/Actions set forth in Plaintiff's Notice of Rule 30 (b)(6) Deposition of Defendant (Deposition Ex. 1)  and submitted herein as Ex. 10  in support of Plaintiff's Response].

hostile work environment claim asserts the hostile work environment claim was created, perpetuated, and tolerated by Doe's supervisory chain of command: Tipton, direct supervisor; Mike, second level supervisor and manager; and Painter, third level supervisor and manager.

Under current law, an employer is always liable for harassment by a supervisor on a prohibited basis that culminates in a tangible employment action. No affirmative defense is available in such cases.[14]  Additionally, the Supreme Court has held that an employer "is subject to vicarious liability to a victimized employee for actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 742, 765 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 775, 807 (1998).

### C.    First Theory: Hostile Work Environment Based on Same Sex

The Commission meets the prima facie elements of a sexually hostile work environment claim. Doe: (1) belongs to a protected group; (2) was subjected to unwelcome sexual harassment; (3) the harassment was based upon the employee's sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and

---

[14]   Of course, traditional principles of mitigation of damages apply in these cases, as well as all other employment discrimination cases. *See generally Ford Motor Co. v. EEOC*, 458 U.S. 219 (1982).

conditions of employment and create a discriminatorily abusive working environment; and (5) the sexual harassment is imputable to the employer.

*Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 808 (2010)(*en banc*).*

Eleventh Circuit precedent mandates that courts consider "the totality of the circumstances" in assessing the severity or pervasiveness of harassment. *See, e.g., Miller v. Kenworth of Dothan, Inc*., 277 F.3d 1269, 1277 (11th Cir. 2002).

> "Workplace conduct is not measured in isolation." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (*per curiam*). Rather, the evidence of harassment is considered both cumulatively and in the totality of the circumstances. Mendoza, 195 F.3d at 1242.

*Reeves v. C.H. Robinson Worldwide, Inc.,* 594 F.3d 798, 808 (11th Cir. 2010) (*en banc*). The U.S. Supreme Court has cautioned that harassment need not be shown to be so extreme that it produces tangible effects on job performance to be actionable. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 22 (1993).

Defendant admits Mike and Painter had supervisory authority over Doe. Doe reported directly to Tipton, Renew Blend Supervisor.[15] Tipton reported to Mike, Assistant Operations Manager. Mike reported to Painter, Facility Operations Manager.[16] Painter reported to Bedford, Vice President of Operations. [17] Tipton, Mike, and Painter worked in the warehouse with Doe. **Tipton, Mike, and Painter**

---

[15] Ex. 6 [Dep. (Tipton) 20:4-9]
[16] Ex. 7 [Dep. (Mike)13:19-14:16; 15:22-16:1-9]
[17] Ex. 3 [30(b)(6) Dep. (Chapman) 30:2-6]

**held higher positions of authority than Doe and had the ability to direct Doe to perform certain duties**.[18] Tipton had daily contact with Doe.[19] Tipton had the authority to issue Employee Counseling Reports to Doe, including disciplinary reports. [20] Mike and Painter had the authority to: (a) take disciplinary action against Doe; and (b) direct Tipton to take disciplinary action against Doe.[21] [22]

Painter and Mike engaged in relentless and vile sexual comments and conduct, solely targeted at Doe.  The conduct complained of was severe and pervasive, and sufficient to constitute a discriminatory abusive work environment. Evidence of Mike and Painter's attacks on Doe, and the severity, pervasive, and abusive nature of such comments, includes but is not limited to: (a) Defendant's admission that Mike, Painter, and Tipton, were disciplined for **unlawful discrimination**; (b) Defendant's admissions, by Mike, Painter, and Chapman, of the sexually offensive comments made by Mike and Painter targeted at Doe; (c) Mike's lack of knowledge of the number of occasions he made his admitted sexually offensive statements to Doe;  (d) Doe's testimony, including but limited to Mike and Painter's use of the Defendant's 25 Comments/Actions against him and Doe's description of the impact such comments and actions had on him; (e) Doe's description of Mike and Painter's sexually offensive comments and actions

---

[18]  Ex. 3 [30(b)(6) Dep. (Chapman) 31:20-23; 32:1-3]
[19]  Ex. 6 [Dep. (Tipton)  44:17-20]
[20]  Ex. 6 [Dep. (Tipton)  58:6-12]
[21]  Ex. 7 [Dep. (Mike)   15:19-16:3]
[22] Ex. 8  [Dep. (Painter) 18:10-20]

directed solely at Doe, which are in addition to Defendant's 25 Comments/Actions; (f) the Declaration of Merrell Smith, describing the offensive nature of Mike and Painter's comments and actions against Doe; and (g) the Declaration of Nathaniel Shane Blackmon, describing the offensive nature of Mike and Painter's comments and actions against Doe.

The Commission establishes Defendant's liability because Mike and Painter, key supervisors, with significant power over Doe, took the sexually offensive actions.  Defendant is subject to vicarious liability to the victimized employee Doe for the actionable hostile environment, taking the form described herein and created by Tipton, Mike, and Painter who were each supervisors with immediate (or successively higher) authority over Doe.  See *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998) and *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998).

### *(1)    Defendant's Position*

 Defendant argument on the hostile work environment claim based on sex is the following:  "The EEOC's hostile work environment claim fails as a matter of law as it cannot demonstrate: (1) Doe was harassed because of his sex; or (2) the harassment was severe."[23] Accordingly, Defendant's Motion challenges only the "because of sex" prong and allegations of severity (a portion of the severe or pervasive prong).  The Commission affirmatively asserts that the harassment

---

[23] Defendant's Brief, p. 23.

was because of sex and that the harassment was severe in addition to being pervasive.

### (2)    *Defendant's claim Doe was not harassed because of his sex.*

Defendant's Brief  essentially relies on two cases to support its argument that  Doe was not subject to a hostile work environment based on sex: (1) *Oncale, supra,*  523 U.S. 75;; and (2) *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498 (6th Cir. 2001). Neither of these decisions supports granting Defendant' Motion on the Commission's claim that Doe was subject to a hostile work environments based on sex.

### (a)    <u>*Defendant Misinterprets Oncale*</u>

Defendant asserts: "The United States Supreme established three (3) ways in which an employee may demonstrate same sex harassment was because of his or her sex: (1) by credible evidence that harasser was homosexual; (2) by evidence the harasser is hostile toward persons of the plaintiff's gender in the workplace; and (3) by comparator evidence to show the harassers treated women and men differently." *Oncale*, 523 U.S. at 80-81.

Critically, Defendant misstates *Oncale* because *Oncale* did not "establish" three avenues for an employee to prove same-sex discrimination was because of his sex.  Additionally, Defendant fails to acknowledge that *Oncale* and its progeny

12

make clear the methods of proof for harassment discussed in those cases are neither exhaustive nor required.

In *Oncale*, the Supreme Court held that same sex harassment is actionable under Title VII. 523 U.S. at 79.  In reaching its holding, the Court held: "Title VII's prohibition of discrimination 'because of … sex' protects men as well as women" and "must extend to sexual harassment of any kind that meets the statutory requirements." *Id. a*t 78, 80.  The Court recognized that "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Id.*   In fact, in *Oncale*, there is no discussion and no evidence in the decisions that any of the harassers were homosexual.  In *Schmedding v. TNEMEC Co., Inc.*, 187 F.3d 862, 865 (8th Cir. 1999), the court noted that *Oncale* "dealt with [a] claim[] of same-sex harassment by heterosexual males against a heterosexual male plaintiff." 187 F.3d at 865 (citing *Oncale*, 523 U.S. at 77).

The Oncale Court provided three examples of typical ways a plaintiff might ***prove* discrimination because of sex**.  However, the opinion does not characterize this list as exhaustive.  Rather, the Court concluded, "[w]hatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina [tion]*… because of … sex.'"

13

*Id.* at 81. Therefore, *Oncale* requires only that the plaintiff prove, in accordance with Title VII, that the discrimination was because of sex.

"[W]e discern nothing in the Supreme Court's decision indicating that the examples it provided were meant to be exhaustive rather than instructive. The Court's focus was on what the plaintiff must ultimately prove rather than the methods of doing so. Indeed, the Court has previously made clear that the means of proving discrimination cannot be reduced to rigid formulae." *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999) (citing *Furnco Constr. Corp. v. Waters,* 438 U.S. 567,577 (1978)). *See also, e.g., Pedroza v. Cintas Corp.*, 397 F.3d 1063, 1068 (8th Cir. 2005) (describing the list of evidentiary routes as "non-exhaustive"); *James v. Platte River Steel Co.*, 113 Fed.Appx. 864, 2004 WL 2378778 (10th Cir. 2004) (same); *Bibby v. Philadelphia Coca Cola Bottling Co.*, 260 F.3d 257, 264 (3d Cir. 2001). "What matters, then, is not whether the facts that [plaintiff] has alleged correspond exactly to any of the examples the Supreme Court has identified, but whether a reasonable factfinder could infer from those facts that [plaintiff] was harassed 'because of' his sex." *Shepherd*, 168 F.3d at 1009.

In keeping with the Supreme Court's instructions on what the plaintiff must "ultimately prove," some courts have directly addressed the issue of whether the harassment was because of sex, without identifying a particular

evidentiary route, similar to how courts treat opposite sex harassment cases.  For example, in *Price v. Dolphin Services, Inc.*, 99-3888, 2000 WL 1789962 (E.D. La. 2000), the court denied Defendant's motion for summary judgment in a same sex harassment case, holding that the conduct "could constitute harassment based on sex which would offend Title VII." *Id.* at *5.   The conduct referenced by the court included plaintiff's supervisors and co-workers calling him "fairy boy," "cupcake," "faggot," and "Joe's bitch."   Similarly, in *Ashmore v. Thayer Co., Inc.*, 303 F. Supp. 2d 1359 (M.D. Ga. 2004), another same sex harassment case, the Court held, without specifying a particular evidentiary route, that:

> sufficient evidence was presented from which a reasonable jury could have concluded that [the supervisor's] harassment of Plaintiffs was based upon their male gender. . . . [The supervisor's] conduct, which was reserved only for male employees and included the simulation and discussion of sexual acts between males, supports the jury's conclusion that the harassment was gender based.

*Id.* at 1369.

### (b) *EEOC v. Harbert-Yeargin, Inc., 266 F.3d 498 (6th Cir. 2001).*

*EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498 (6th Cir. 2001) is distinguishable from the present case. First, *Harbert* is a decision by the Sixth Circuit Court of Appeals and therefore is not binding on this Court. Second, *Harbert* was in a different procedural and legal posture than this case. In *Harbert*,

a jury reached a verdict, followed by the District Court granting a partial judgment as a matter of law. *Harber*t articulated its standard of review, a significantly more demanding standard than the Commission's obligation to rebut Defendant's burden of proof on Defendant's Motion. *Harbert,* 266 F.3d at 504, stated:

> When reviewing a jury verdict, "[j]udgment as a matter of law is appropriate only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party." "[U]nless this Court is left with the definite and firm conviction that a mistake resulting in plain injustice has been committed, or unless the verdict is contrary to all reason, we must affirm the jury's verdict." [Internal quotation marks and citations omitted].

Third, *Harbert's* opinions are delivered in a unique fashion. The dissenting Circuit Judge Gilman writes the lengthy opinion for the Court, and thereby provides points and findings for both the Defendant and Commission. Subsequently, Circuit Judge Guy wrote a concurring and dissenting opinion, which is joined by the third Circuit Judge on the panel, and thereby constitutes the Court's ruling.

Fourth, a factual distinction exists between *Harber*t and the current case. In *Harbert*, the EEOC filed an action, including a claim for sexual harassment, on behalf of three male employees of *Harbert*. A fourth male employee intervened. The Commission and Intervener asserted their supervisor and co-workers had sexually harassed them. The employer did not discipline any of the harassers. In this action, Doe was the sole target of Mike and Painter's continuous and relentless

16

verbal harassments and actions. There is no evidence that any other employee was subjected to the continual harassment targeted at Doe. Even assuming Mike or Painter made an isolated sexual comment to another employee, no employee other than Doe complained in any manner.  Doe continually complained to Tipton, Mike, Painter, and Chapman. Doe testified:

> Q.     **And you believed, did you not, that the comments made by Randy Painter and Michael McPherson were unlawful harassment**?  Is that what you believed at some point? [Emphasis supplied].
>
> A.     Yes.[24]

The Defendant found Tipton, Mike, and Painter had engaged in **unlawful discrimination against Doe**. However, they were given the lowest form of discipline available, an unwritten verbal counseling. Simply put, the facts in the present case are more focused and established than in *Harbert*, which involved four male employees seeking judicial relief against the employer, and cited a supervisor, and an identified number of co-workers as the harassers. Moreover, not every alleged victim filed an internal complaint. Finally*, Harbert* misinterprets *Oncale*.  Judge Gilman wrote:

> But the majority, despite its denial… implies that *Oncale* limits the actionability of Title VII same-sex harassment claims to situations where the "harasser was a homosexual," . . . .I disagree that *Oncale* imposed such a limitation. The Court presented two illustrations of other situations in which a trier of fact might reasonably find discrimination. *See Oncale,* 523 U.S. at 80–81, 118 S.Ct. 998. Moreover, the Court presented these illustrations as

---

[24] Ex. 5 [Dep. (Doe) 379:18-380:8]

examples, and not as an exhaustive list of all possible situations in which a
plaintiff would have an actionable Title VII same-sex harassment claim.
266 F.3d at 506.

Accordingly, based on the above discussion, *Harbert* does not support the
granting of Defendant's Motion in issue.

> **(2)    Defendant: The EEOC cannot demonstrate Doe was
>          harassed because of any purported failure to conform
>          to male stereotypes.**

Title VII prohibits discrimination on the basis of sex, including
discrimination on the basis of sex stereotypes. This prohibition applies to all
types of sex discrimination, including sexual harassment. In *Price Waterhouse
v. Hopkins*, 490 U.S. 228 (1989), the Supreme Court held that a plaintiff can
prove discrimination "because of sex" under Title VII through evidence of
discrimination for failing to conform to a gender stereotype. The Court further
noted that sex stereotyping is legally relevant within the framework of Title VII:
"[i]n forbidding employers to discriminate against individuals **because of their
sex**, Congress intended to strike at the entire spectrum of disparate treatment of
men and women resulting from sex stereotypes." 490 U.S. at 251 [Emphasis
supplied –Internal citation and quotation omitted].

A wide range of courts have explicitly held that same sex harassment was
"because of sex" where the plaintiff was harassed for failure to conform to the
stereotype of his or her gender. Title VII's prohibition of discrimination on the

basis of sexual stereotypes applies to sexual harassment. *See, e.g., Dawson v. Bumble & Bumble,* 398 F.3d 211, 218-21 (2d Cir. 2005) (recognizing gender stereotyping claim); *Medina v. Income Support Div. of N.M.,* 413 F.3d 1131,1135 (10th Cir. 2005) (same); *Nichols v. Azteca Rest. Enters.,* 256 F.3d 864, 874-75 (9th Cir. 2001) (recognizing Title VII same sex harassment claim after plaintiff proved he was harassed because of sex by coworkers who referred to him in female terms and ridiculed his allegedly female mannerisms). *See Bibby v. Philadelphia Coca Cola Bottling Co.*, 260 F.3d 257, 263-264 (3d Cir. 2001); *Simonton v. Runyon,* 232 F.3d 33, 37-38 (2d Cir. 2000); *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 259, 261 n.4 (1st Cir. 1999); *Doe v. City of Belleville,* 119 F.3d 563, 580-83 (7th Cir. 1997), *vacated on other grounds,* 523 U.S. 1001 (1998). *See also Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011) (discrimination against a transgender individual because of gender nonconformity is sex discrimination in violation of equal protection clause).

The Commission asserts a Title VII same sex harassment theory because of Doe's failure to conform to the stereotype of his gender. *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) held a plaintiff can prove discrimination because of sex under Title VII through evidence of discrimination for failing to conform to a gender stereotype. In *Price Waterhouse*, the Supreme Court held that Title VII prohibits discrimination on the basis of sex, including discrimination on the

basis of sex stereotypes. This prohibition applies to all types of sex discrimination, including sexual harassment. This theory has been further established and developed through the progeny of *Price Waterhouse.*

In *Glenn v. Brumby*, 663 F.3d 1312, 1316-1317 (11th Cir. 2011), the Court recognized the theory of sexual harassment in the form of gender stereotyping. *Brumby* relied on *Price Waterhouse, supra*, 490 U.S. 228, 250-251, 258-261, and 272-273. *Price Waterhouse* held Title VII barred not just discrimination because of biological sex, but also gender stereotyping—failing to act and appear according to expectations defined by gender. The Court noted that "[a]s for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotypes associated with their group...."  490 U.S. at 251.

*Brumby* held: (1) "instances of discrimination against plaintiffs because they fail to act according to socially prescribed gender roles constitute discrimination under Title VII according to the rationale of *Price Waterhouse;* and (2)  all persons are protected from discrimination on the basis of gender stereotype. An individual cannot be punished because of his or her perceived gender-nonconformity.  663 F.3d at 1316-1317.

Under applicable Supreme Court precedent, where supervisors, particularly in an all-male work environment, harass a male plaintiff for "feminine" behavior

or attributes, it may constitute harassment "because of sex." In *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061 (9th Cir. 2002) (en banc), the court held that a male employee stated a claim for sexual harassment where several of the other male butlers subjected him to a hostile work environment, including whistling, blowing kisses, calling plaintiff "sweetheart" and "muñeca" (Spanish for doll), telling crude jokes, showing plaintiff pictures of naked men having sex, and engaging in offensive physical conduct of a sexual nature. *Id.* at 1064.  The court compared the conduct to that of the all-male workplace in *Oncale*, and concluded that it was "a fairly straightforward sexual harassment claim." *Rene*, 305 F.3d at 1068. Three Judges, concurring in the opinion, noted that it was "a case of actionable gender stereotyping harassment." *Id.* at 1068 (Pregerson, J., concurring).  *See also Lopez v. River Oaks Imaging & Diagnostic Group, Inc.*, 542 F. Supp. 2d 653, 660 (S.D. Tex.2008) (holding Title VII is violated when an employer discriminates against any employee, because he or she has failed to act or appear sufficiently masculine or feminine enough for an employer.) Moreover, "[J]ust as a woman can ground an action on a claim that men discriminated against her because she did not meet stereotyped expectations of femininity, a man can ground a claim on evidence that other men discriminated against him because he did not meet stereotyped expectations of masculinity." *Higgins,* 194 F.3d  at 261 n.4. Accordingly, a jury could more than

reasonably conclude that Doe was perceived in the workplace as feminine and not conforming to gender stereotypes concerning "manliness."

In this action, Mike and Painter subjected Doe to a relentless pattern of sexually demeaning comments and actions; which far exceeded the concept of horseplay. These comments and actions include: (1) the aforementioned Defendant's 25 Comments/Actions; (2) Mike and Painter's admissions to making sexual comments and actions directed at Doe; (3) Doe's description of sexual comments/actions from Mike and Painter, which exceed the list of 25 comment/actions; and (4) the Declarations of Merrell Smith and Nathaniel Shane Blackmon. Blackmon's Declaration includes explicit statements made by Mike and Painter to Doe, as well as his following observations of such statements:

> **(9)   Mike McPherson [Mike] and [Painter] called [Doe] offensive and degrading names in a harassing manner; over a long period of time; <u>way beyond the point of a joke or locker room talk.</u>** [Emphasis supplied].
>
> (10)   I viewed the statements by Mike and Painter to [Doe] as offensive and degrading.
>
> (11)   I viewed the statements by Mike and Painter, as attacks on [Doe]'s masculinity; statements cutting down [Doe]'s masculinity.
>
> (12)   Mike and Painter treated [Doe] as feminine.
>
> (13)   Painter and Mike both made the following statements to [Doe], at the worksite, over a long period of time, on almost a daily basis:
>
>> A.   Fag.
>> B.   Faggot.

22

(14)   Mike made the following statements to [Doe], at the worksite:

     A.    Queer. [Mike made this statement to [Doe] numerous times.].

     B.    Everyone needs to pull their pants up because [Doe] is here.

(15)   I did not see any reason for Painter and Mike to make the above statements to [Doe].

(16)   I have known Mr. [Doe] for approximately 30 years. [Doe] is not a homosexual.

(17)   [Doe] talked to me about the above statements Mike and Painter made to him, and about him. [Doe] was very upset, emotional, and stressed about the above statements made by Mike and Painter, and as time passed by, and the statements continued, [Doe] became more upset, more emotional, and more stressed by such statements.[25]

Similarly, Merrell Smith's Declaration includes explicit statement made by

Mike and Painter to Doe, as well as his following observations of such statements:

(4)   I worked closely with [Doe] because he served as my supervisor in his position as Supervisor of the Renew Department. I was a driver in the Department.

(5-6)  Mike McPherson [Mike] served as [Doe's] second level supervisor. Randy Painter [Painter] served as [Doe's] third level supervisor. Painter was the main boss for the warehouse facility in which [Doe] and I worked.

(7)   Mike and Painter called [Doe] offensive and degrading names in a harassing manner.

(8)   I viewed the statements by Mike and Painter, to [Doe], as attacks on [Doe's] masculinity; for example, statements to cut down [Doe's] masculinity.

(9)   Mike and Painter treated [Doe] as feminine.

---

[25] Ex. 14 [Declaration of Nathaniel Shane Blackmon,  para. 9-17]

(10)   Painter and Mike both made the following statements to [Doe], at the worksite:

  A.   You are feminine.
  B.   If you would just act more like us; watch football, go hunting; you would     not have these problems (i.e. being called such offensive names and treated in the manner in which he was treated).
  C.   Fag.
  D.   Faggot.
  E.   Fairy.
  F.   Fag-Fairy.
  G.   Queer.
  H.   Ass-breath.
  I.   Dick-sucker.
  J.   Homo.

 (11)   Painter made the following statements to [Doe], at the worksite:

  A.   You act and walk like a woman or girl.
  B.   Whistling at Mr. Doe, in the offensive manner that a man may whistle at a female.
  C.   Dick-Sucking-Queer.
  D.   You have had plenty of nuts in your mouth before.
  E.   What do you do, put your cell phone up your butt and make it vibrate like a butt plug.

(12)   Mike made the following statement to [Doe], at the worksite:

  A.   When somebody's pants fall down, [Doe] walks in.

(13)   I am aware that during the time [Doe] was employed at McPherson Companies, someone placed a deer's testicles and two chopped-off deer legs; on [Doe's] work desk, which was covered in the blood from the animal parts.

(14)   I viewed the statements by Mike and Painter, to [Doe], as offensive.

(15)   I observed [Doe] become increasingly emotionally upset because of the statements directed at him by Mike and Painter.

(16)   I am aware that [Doe] complained to Mike and Painter about the statements and asked them to stop making the offensive statements to him. Also, I am aware that [Doe] complained to Anne Chapman, McPherson Companies' Human Resources Director, about the statements made by Mike and Painter,  and asked her to have Mike and Painter, to stop making the statements to [Doe].

(17)   Painter, following [Doe's] objections to the statements and complaints concerning the statements, continued to make such offensive statements **to [Doe]**, up to the time [Doe] was discharged by McPherson Companies.[Emphasis supplied].

(18)   Painter, following [Doe's] discharge from employment at McPherson, continued to make such statements about [Doe].[26]

Critically, Defendant, via Chapman, explicitly found that Mike and Painter had made sexually offensive comments to Doe. Such findings cannot be viewed as banter because Defendant, via Chapman, found that Mike, Painter, and Tipton had engaged in **unlawful discrimination**.   Moreover, *assuming arguendo*, Doe appeared to conform to the male gender norm; Mike and Painter viewed him as conforming to such norm; and Mike and Painter intended to simply "be joking" with Doe. Such a scenario does not entitle Defendant to summary judgment because Mike and Painter's comments and actions, viewed in their totality and in a cumulative manner, were unquestionably sexual in nature. Such comments were not mere banter or jokes. For example, there is an objectively undisputed and

---

[26] Ex. 12 [Declaration of Merrell Smith, para. 4-18]

significant legal distinction between Doe calling a co-worker "fat" and Doe's second and third level supervisors calling Doe a queer, faggot, or implying he would perform oral sex on another man. Moreover, Mike and Painter subjected Doe to the continual and targeted onslaught of such comments. Finally, Defendant found Mike and Painter engaged in **unlawful discrimination**.

This legally-recognized form of sexual harassment is also scientifically-recognized. Plaintiff submits the Expert Witness Report of Jennifer L. Berdahl, Ph.D., Associate Professor of Organizational Behavior and Human Resource Management at the Joseph L. Rotman School of Management at the University of Toronto. Dr. Berdahl's primary research area is sex-based harassment and discrimination in organizations.[27] Dr. Berdahl has studied sex discrimination for over 15 years. Dr. Berdahl's research revealed that men experience sex harassment from other men, and she identified a kind of harassment not previously identified in the literature on sexual harassment: Harassment of men for violating masculine stereotypes. Dr. Berdahl's follow-up research revealed that this type of harassment was not uncommon and was more upsetting to men than the traditional forms of harassment.[28] Dr. Berdahl's report submitted four opinions in this case, based on the analysis set forth in her Report:

---

[27] Ex. 11 [Expert Witness Report of Jennifer L. Berdahl, Ph.D., p. 1].
[28] Ex. 11 [Expert Witness Report of Jennifer L. Berdahl, Ph.D., p. 2]

(1) "*John Doe was repeatedly subjected to gender stereotype harassment and discrimination by Mike McPherson and Randy Painter.*"[29]

(2) "*John Doe threatened the gender (masculine) identities of the perpetrators of this masculinity harassment against him, motivating them to harass Doe.*"[30]

(3) "*The masculinity harassment directed against John Doe was conducted with malicious intent to debase and humiliate Doe in front of others.*"[31]

(4) "*John Doe appears to have responded to this harassment in a reasonable way, taking slowly escalating measures to stop the harassment. His response was typical of other victims of sex harassment.*"[32]

### (3)   Defendant: The EEOC cannot demonstrate the alleged harassment  was severe.

Defendant is correct in stating: "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview." *Harris, supra,* 510 U.S. 17, 21 (1993).

Defendant is incorrect in stating: "The Eleventh Circuit Court of Appeals has set a high bar for establishing the harassing conduct was sufficiently severe and pervasive to create a hostile work environment." This is not a proper statement of

---

[29] *Id.*, p. 9.
[30] *Id.*, p. 10.
[31] *Id.*, p. 11.
[32] *Id.*, p. 11. [Dr. Berdahl's extensive credentials are discussed more fully in her Report. Defendant has offered no countervailing expert. Defendant deposed Dr. Berdahl.]

the law because a plaintiff only needs to establish whether the contested conduct is **severe or pervasive**; not both severe **and** pervasive. *Reeves v. C.H. Robinson Worldwide, Inc.,* 594 F.3d 798, 808 (11th Cir. 2010)(*en banc*).

Doe's severe and pervasive harassment over a period from February 2005/April 2005, until he was discharged in February 2008, created a hostile work environment. Defendant distorts the record when it diminishes explains the number of statements which Doe was subjected to by Mike and Painter, his second and third level supervisors. As previously discussed in detail, Mike and Painter subjected Doe to a relentless pattern of sexually demeaning comments and actions; this behavior far exceeded the concept of horseplay. These comments and actions include: (1) the aforementioned Defendant's 25 Comments/Actions; (2) Mike and Painter's admissions to making sexual comments and actions directed at Doe; (3) Doe's description of sexual comments/actions from Mike and Painter, which exceed the list of 25 comment/actions; and (4) the Declarations of Merrell Smith and Nathaniel Shane Blackmon.

Mike and Painter comments and actions, viewed in their totality and in a cumulative manner, establish Mike and Painter subjected Doe to the continual and targeted onslaught of such comments. Critically, Defendant, via Chapman, explicitly found that Mike and Painter had made sexually offensive comments to

Doe. Such findings cannot be viewed as banter because Defendant, via Chapman, found that Mike, Painter, and Tipton had engaged in **unlawful discrimination.**

Defendant also contends that when considering the context in which these statements were made, they fail to rise to the level of hostile work environment. Doe never admitted to calling anyone a sexually offensive name. Defendant never disciplined Doe for banter or violation of the Sexual Harassment policy.

Plaintiff disputes that: (1) the references to "fag," "faggot," " homo," "queer," and "dick sucker" were not reserved exclusively for Doe; and (2) such statements were among the everyday banter among the male employees who worked in the warehouse. In response, Plaintiff cites the following facts: (1) Mike and Painter admitted they made such offensive comments to Doe, and Mike could not recall the number of times he made such comments; (2) Mike and Painter were disciplined for their conduct toward only one person, Doe, and such discipline was for unlawful discrimination against Doe; (3) there is no evidence that any employee complained about being subjected to sexually offensive comments; (4) these comments occurred from February-April of 2005 until Doe's discharge; (5) such comments were from his second and third level supervisors; (6) Doe repeatedly complained to make the comments cease; he complained to Tipton on five to eight occasions, to Mike and Painter, and to Chapman on multiple occasions. In light of the above, Defendant's allegation that the comments were

just banter and horseplay is in direct contradiction to Defendant's own admissions, and the facts at issue. Finally, "sexual comments alone can rise to the level of actionable harassment." *See Harris*, 510 U.S. at 19, 21-23.

Moreover, *Oncale* recognized the importance of the context of the conduct in issue: Indeed, in addressing the evaluation of the **severity** of a given harassment claim, the Supreme Court in *Oncale* specifically stated:

> We have emphasized, moreover, that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." In same-sex (as in all) harassment cases, that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. . . . . The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.

523 U.S. at 81–82.18 S.Ct. 998

In *E.E.O.C. v. Grief Brothers Corp.*, 2004 WL 2202641, *7-9 (W.D.N.Y., 2004), the Court presents a vivid explanation of the severe or pervasive requirement of a hostile work environment claim. Courts examine various factors to ascertain whether a work environment is sufficiently hostile or abusive to support a Title VII claim. These factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Harris,* 510 U.S. at 23. The appropriate test is

30

whether the "harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse...." *Grief Brothers,* 2004 WL 2202641, at *8.  As the  Second Circuit has explained:

> The environment need not be unendurable or intolerable. Nor must the victim's psychological well-being be damaged. In short, the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases.

*Terry v. Ashcroft*, 336 F.3d 128, 147-48 (2d Cir 2003)(quotations, citation, and alterations omitted).

In this action, virtually every fact related to the treatment Doe endured during his employment with Defendant is contested. Nonetheless, there can be no doubt that these incidents viewed in their totality (if found by a jury to have occurred), are sufficiently pervasive, severe, and frequent to support a finding that Plaintiff's workplace was altered for the worse. The record contains sufficient evidence from which a reasonable jury could find Doe was subjected to severe and pervasive discriminatory conduct that altered his work environment. The evidence would support such a finding on both the subjective and objective prongs. Accordingly, summary judgment on this basis is not warranted.

**B.     Defendant: The EEOC Cannot Overcome McPherson's Affirmative *Ellerth/Faragher* defense**.

The *Faragher/Ellerth* defense mandates that an employer may avoid vicarious liability by raising as an affirmative defense that it: (1) exercised reasonable care to **prevent <u>and</u> correct** promptly any harassing behavior, **and** (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher, supra,* 524 U.S. at 807, 809. ["*Faragher* defense"]. Critically, "**Both elements [of the affirmative defense] must be satisfied ... and the defendant bears the burden of proof on both elements**." *Frederick v. Sprint/United Mgmt. Co.,* 246 F.3d 1305, 1313 (11th Cir. 2001).

### *(1)     First Element of Defense: Defendant Did Not Exercise Reasonable Care to Prevent and Correct the Hostile Work Environment*

Here, Defendant's supervisors and managers knew of the conduct of Painter and Mike, and did not exercise reasonable care to **prevent <u>and</u> correct** promptly such harassing behavior, but rather condoned it, and/or participated in such unlawful conduct. Defendant is required to satisfy both prongs of this first element of the affirmative defense: (a) exercise reasonable care to prevent harassment; and (b) correct promptly harassing behavior. Defendant cannot satisfy either of the two required prongs of the first element of this defense**. Significantly, the Defendant itself was engaging in the creation and perpetuation because Mike and**

32

**Painter, Managers and Doe's Supervisors, were the harassers**. Defendant found their harassment of Doe constituted **unlawful discrimination** and warranted only a verbal counseling.

As a matter of policy, the *Faragher* defense, upon which Defendant has the burden of proof, cannot permit Defendant to have two managers and supervisors, Mike and Painter, engage in open and continuous harassment, and thereafter, find such harassment to be unlawful discrimination; and subsequently retain the harassers and discharge Doe, the target of the harassment.

**Mike admits Doe complained to Mike regarding the comments made to him.** [33] Mike understood Doe's complaint: (a) related to comments directly against Doe; and (b) included Mike's and Painter's comments to Doe.[34] Doe complained to Mike that the comments needed to stop, Doe was tired of them, and it was getting old.[35]

**Critically, Mike, upon receiving Doe's complaints, did not report such complaints to Chapman**.[36] Defendant's policy mandates any supervisor/manager who becomes aware of possible sexual or other unlawful harassment should

---

[33] Ex. 7  [Dep. (Mike) 45:5-8]
[34] Ex. 7  [Dep. (Mike) 46:13-22]
[35] Ex. 7  [Dep. (Mike) 70:11-17]
[36] Ex. 7  [Dep. (Mike) 77:2-8]

promptly advise the Human Resources Manager or any member of management who will handle the matter in a timely and confidential manner.[37]

Mike's failure to report the complaints of harassment violates Defendant's policy and deprives Defendant of the *Faragher* defense because this defense requires an employer to require all supervisors to report all complaints of harassment to appropriate officials. *Wilson v. Tulsa Junior College*, 164 F.3d 534, 541 (10th Cir. 1998).

Defendant may attempt to rest its defense on **the mere existence,** and claimed dissemination, of an employee handbook and a written sexual harassment policy containing complaint reporting requirements. Defendant's position is unjustified.  The record is clear that no matter what policy or complaint process Defendant had or disseminated, it was ineffective. The conduct of Painter and Mike was open and notorious, and Defendant, was aware of it, acquiesced to it, and/or participated in it.

 Applicable legal precedent addressing the standards for an adequate anti-harassment policy further supports the EEOC's position. Not every harassment policy will demonstrate reasonable care to prevent a sexually hostile environment. To establish that it took reasonable steps to prevent harassment, the employer is required to show that the policy: (1) was effectively published, (2) contained

---

[37] Ex. 1C

reasonable complaint procedures, and (3) it contained no other fatal defect. *See Faragher,* 524 U.S. at 808 [denying an employer the affirmative defense because the employer had "entirely failed to disseminate its [policies]," the policies did not contain reasonable complaint procedures, and because the employer failed to supervise management personnel. *Frederick, supra,*. 246 F.3d at 1313 -1314.

Defendant's policy was defective because it did not contain an impartial, reasonable complaint procedure. The policy provided that a person must complain to a supervisor or to Human Resources. Based on Defendant's facts, Doe properly complained to Tipton, his immediate supervisor, on six to eight occasions; however, despite Doe's requests to Tipton, Tipton did not stop the comments from Mike and Painter Thus, Doe was forced to complain to Mike and Painter, harassers who ignored Doe's complaints, and continued to make sexually offensive comments to Doe. Thereafter, Doe complained to Chapman, whose adverse actions toward Doe establish her lack of impartiality.

**Defendant's policy was neither effectively published nor was it without a fatal defect because Defendant did not train the key supervisors and managers concerning the harassment policy.** *Ellison v. Brady*, 924 F.2d 872, 883 (9th Cir. 1991) ["In order to avoid the loss of well-intentioned productive employees, employers must educate and sensitize their workforce"]; *Lancaster v. Sheffler Enterprises,* 19 F.Supp.2d 1000, 1003 (W.D.Mo., 1998) [Simply forcing

all new employees to sign a policy does not constitute "reasonable care." The employer must take reasonable steps in preventing, correcting, and enforcing the policy. Reasonableness requires more than issuing a policy.]

**Defendant never explained to Tipton: (a) the type of conduct that constitutes sexual harassment when a man's conduct is asserted to be offensive against another man;[38] (b) the meaning of equal employment opportunity (EEO) retaliation.[39] (c) how to resolve an internal EEO complaint;[40] (c) preserve evidence;[41] (d) maintain an investigation file for an EEO complaint;[42] or (e) respond to an EEOC complaint.[43]**

Also, Tipton does "not remember" receiving any training as to how to train other employees concerning unlawful sex harassment involving a male's conduct against another male.[44] Mike, as Assistant Operations Manager, "does not know" if had received any training as to: (a) the definition of unlawful sexual harassment when it involves a man engaging in offensive conduct toward another man; (b) the procedure for responding to sexual harassment complaints involving a man's offensive conduct toward another man; or (c) how to preserve evidence when an employee files an internal complaint of unlawful sexual harassment involving a

---

[38] Ex. 6 [Dep. (Tipton)  19:5-10]
[39] Ex. 6 [Dep. (Tipton)  19:11-14]
[40] Ex. 6 [Dep. (Tipton)  18:6-7]
[41] Ex. 6 [Dep. (Tipton)  18:16-19]
[42] Ex. 6 [Dep. (Tipton)  18:20-19:1]
[43] Ex. 6 [Dep. (Tipton)  19:2-4]
[44] Ex. 6 [Dep. (Tipton)  17:2-7]

male's conduct toward another male.[45] Concerning internal complaints of sexual harassment involving offensive conduct by a man toward another man, Mike did not receive any training how to respond to such complaints.[46]  In addition, Mike never received any training as to how to investigate effectively a sexual harassment or retaliation complaint.[47] Mike did not train any of the employees he supervised as to the: (a) definition of unlawful harassment involving a male against another male; (b) how to respond to an internal complaint of sexual harassment involving a male against a male; (c) how to respond to an internal employment of equal employment opportunity retaliation. [48] Moreover, Mike never provided any training to Tipton concerning unlawful sexual harassment or equal employment opportunity retaliation.[49] Significantly, prior to Doe's discharge in 2008: (a) Mike's training concerning sexual harassment and retaliation consisted of receiving an employee handbook from Defendant in 2005; and (b) Mike did not attend any meetings or visit with anyone for training on sexual harassment or retaliation other than receiving the handbook.[50]

---

[45]  Ex.7 [Dep. (Mike) 17:22-18:5; 18:14-20; 18:21-19:4]
[46]  Ex.7[Dep. (Mike)  18:6-13]
[47]  Ex. 7[Dep. (Mike) 21:10-13]
[48]  Ex. 7[Dep. (Mike) 19:17-22; 20:3-14]
[49]  Ex. 7[Dep. (Mike) 24:6-11]
[50]  Ex. 7[Dep. (Mike) 23:7-19]

37

Critically, Painter did not have any understanding as to the meaning of Title VII.[51] Painter received the Defendant's Employee Handbook dated January 1, 2005; however, he never received any training concerning the Handbook.[52] In addition, concerning Defendant's Sexual Harassment Policy, Painter initially testified that because there was not any acknowledgment signed by him that he received the policy, it is possible he did not receive the policy.[53] Subsequently, Painter testified he received the policy but admitted he has no idea when he received it or when he read the policy.[54] Painter did not provide any training to employees under his supervision concerning: (a) sexual harassment or a hostile work environment based on sex involving offensive conduct by a male toward another male; or (b) EEO retaliation.[55]

At the time of Doe's complaints to Chapman concerning Mike and Painter, Defendant did not have any knowledge that Mike and/or Painter ever received any training in same sex discrimination or same sex harassment.[56] Prior to Doe's complaints to Chapman, Defendant does not have any knowledge that during the tenure of Chapman, since June 1, 2007, Tipton, Mike, or Painter had been given training as to: (a) the definition of unlawful same sex harassment; (b) how to

---

[51]     Ex. 8    [Dep. (Painter)  31:4-6]
[52]     Ex. 8    [Dep. (Painter)  34:8-23; 85:1-11]
[53]     Ex. 8    [Dep. (Painter), 87:10-14; 89:1-9]
[54]     Ex. 8    [Dep. (Painter), 89:22-23; 90:1; 91:6-9]
[55]     Ex. 8    [Dep. (Painter), 33:5-17]
[56]     Ex. 3    [30(b)(6) Dep. (Chapman) 112:7-17]

develop a comprehensive anti-harassment same-sex policy; (c) how to conduct an effective investigation of a same sex harassment charge; (d) how to resolve a complaint of same-sex harassment; (e) preserving evidence  and the investigation file;[57] (f) how to respond to an administrative complaint of same-sex harassment; or (g) any training as to how to train  other employees concerning same-sex harassment charges.[58] Furthermore, Defendant, via Chapman, did not give any same-sex discrimination or harassment training to Defendant's employees prior to date of Doe's discharge.[59] Defendant did not provide Tipton, Mike, and Painter any training concerning equal employment opportunity retaliation prior to June, 2008, approximately (4) four months after Doe's discharge. [60]

Finally, Defendant is required to show that it acted reasonably promptly on the victim's complaint once it received notice.  Given the ineffective nature of the policy at issue, and the fact that Tipton, Mike, and Painter were Supervisors and Managers, Defendant was on "notice" when the harassment began because its own officials were engaging in the prohibited conduct.  *Miller, supra,*  277 F.3d 1269, 1279-1280.

Knowledge on the part of the very persons (supervisors and managers) designated to receive complaints likewise put Defendant on notice.  *Breda v. Wolf*

---

[57] Ex. 3 [30(b)(6) Dep. (Chapman) 127-18-23; 128:1-23; 129:1-17]
[58] Ex. 3 [30(b)(6) Dep. (Chapman) 130:1-11]
[59] Ex. 3 [30(b)(6) Dep. (Chapman) 23:7-19]
[60] Ex. 3  [30(b)(6) Dep. (Chapman) 133:18-23;134:1-15]

*Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000), citing *Coates v. Sundor*

*Brands, Inc.,* 164 F.3d 1361 (11th Cir.1999), states:

> [W]e held that if an employer has a company policy specifically designating
> the person or persons to whom an employee should report instances of
> suspected sexual harassment, once the employee complains to the designated
> person or persons, the employer is deemed to have actual notice of the
> harassment. *See id.* at 1364. With such a policy, the employer "itself
> answered the question of when it would be deemed to have notice of the
> harassment sufficient to obligate it or its agents to take prompt and
> appropriate remedial measures."

Once notice is established, the employer must take immediate and

appropriate corrective action.  *Watson v. Blue Circle,* Inc., 324 F.3d 1252, 1261

(11th Cir. 2003). *See also Frederick,* 246 F.3d at 1314; *Minix v. Jeld–Wen, Inc.,*

237 Fed. Appx. 578, 2007 WL 1828259  (11th Cir. 2007).

Defendant's response and policy were inadequate because Defendant did not

provide a reasonable and effective complaint procedure and included the fatal

defect of being ineffective and ignored by Managers and Supervisors. *Miller v.*

*Kenworth of Dothan, Inc*., 277 F.3d 1269, 1279-1280 (11th Cir. 2002) holds that a

policy must be found ineffective when company practice indicates a tolerance

towards harassment or discrimination.

### (2) Second Element of Defense: Doe Followed Policy and Acted Reasonably to Avoid Harm

The second required element of the *Faragher/Ellerth* affirmative defense

requires the employer to show that the complaining employee unreasonably failed

to take advantage of the employer's complaint procedures or otherwise avoid harm. *Faragher,* 524 U.S. at 807; *Ellerth,* 524 U.S. at 765. As previously stated, Doe complained to Tipton on six to eight occasions, requesting Tipton to stop the sexually offensive comments from Mike and Painter. Tipton refused to take any effective action, as requested by Doe. Then, Doe complained to Mike, and this complaint objected to Mike, which included comments by Mike and Painter. Mike violated Defendant's policy by not reporting this complaint to Chapman. Thereafter, Doe complained to Chapman. The result of these events resulted in a series of linked adverse events taken against Doe, resulting in his discharge without any progressive discipline. In contrast, Mike and Painter were merely verbally counseled, despite having engaged in admitted **unlawful discrimination** against Doe. Mike and Painter did not receive any Employee Counseling Report for their treatment of Doe or failure to report Doe's complaints to Chapman, but rather continued their careers with Defendant.

Therefore, Defendant can prove no set of facts to establish any prong of the *Faragher* defense, and summary judgment should be denied to Defendant on this defense, pursuant to Rule 56.

## RETALIATION CLAIM

As developed herein, Defendant cannot establish with a single, clear, consistent voice, any precise and consistent reason for Doe's discharge.

*Defendant's proffered reasons to support Doe's discharge collide with Defendant's own evidence, policies, and practices, rendering Defendant's entire defense to such retaliatory action unworthy of credence.*

*Sharpe v. Global Sec. Intern.,* 766 F.Supp.2d 1272, 1303 (S.D.Ala. 2011), directly supports the Commission's motion on the retaliation claim. As in *Sharpe*, McPherson does not proffer evidence showing why it chose to lay off Doe (as opposed to some other employee). *Sharpe* emphasizes: "**simply saying that there were valid business reasons for conducting a layoff says nothing about the selection process for that layoff or why a particular worker was or was not selected**." 766 F.Supp.2d at 1303. *See generally Collazo v. Bristol–Myers Squibb Mfg., Inc.,* 617 F.3d 39, 51 (1st Cir.2010)("An employer may, of course, exercise its business judgment to eliminate positions as part of a ... reduction in force, even if the individuals in those positions have engaged in protected activity or are members of protected groups.... However, an employer may not use ... 'layoff' as a convenient excuse for terminating an employee on a discriminatory or retaliatory basis.")(Citations omitted).

Accordingly, this Court is justified in finding Defendant's reasons are pretextual and finding Defendant has failed to set forth any justifiable reason to support Doe's discharge, in the context of the myriad of contradictions. Accordingly, the Commission meets its ultimate burden of proof that there are no

genuine issues of material fact, <u>between plaintiff and defendant</u>, and thereby summary judgment is appropriate for plaintiff on the liability component of the retaliation claim.

### 1.    *Prima Facie* <u>Case</u>

Title VII prohibits retaliation against an employee because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing. 42 U.S.C. Section 2000e-3(a).

A *prima facie* case of retaliation under Title VII requires the plaintiff to show that he: (1) engaged in statutory protected expression; (2) suffered a materially adverse employment action [an action which "might have dissuaded a reasonable worker from making or supporting a charge of discrimination];" and (3) there is some causal connection between the protected expression and the adverse action. *Sharpe v. Global Security Int*., 766 F.Supp.2d 1272, 1300 (S.D. Ala. 2011); *Brown v. Metropolitan Atlanta Rapid Transit Authority*, 261 Fed. Appx. 167, 2008 WL 60279 *5 (11th Cir. 2008) [protected opposition to discrimination]; *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006). Retaliation is a separate offense under Title VII; an employee need not prove the underlying claim of discrimination for the retaliation claim to succeed. *Sullivan v. National R.R. Passenger Corp.,* 170 F.3d 1056, 1059 (11th Cir.1999).

### *(a)      First Prong: Statutory Protected Expression*

Concerning the first prong of Title VII, for purposes of this motion, Doe engaged in protected opposition to discrimination by properly complaining to Defendant. Doe complained to Chapman, Director of Human Resources, opposing the sexual harassment he received from Mike and Painter, his second and third level supervisors. According to Defendant, in November, 2007, Doe complained to Chapman that Mike and Painter were calling him fag, faggot, and fag fairy,[61] as well as additional statements set forth in the factual discussion of this brief.

The Supreme Court and the Eleventh Circuit have made it clear that internal complaints of sexual harassment, such as Doe's complaints in issue, constitute statutory protected expression under Title VII. *See Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee, 555 U.S. 271* (2009); *Carter v. Univ. of South Ala. Children's and Women's Hosp.*, 510 F. Supp.2d 596, 608 (S.D.Ala. 2007).Thus, Doe's complains to Chapman are protected expression.

In a Title VII retaliation claim based on opposition to discrimination the "opposition must be directed at an unlawful practice of an employer, not an act by an individual." *Little v. United Technologies*, 103 F.3d 956, 959, cited by *Brown, supra,* 261 Fed. Appx. at 174, 2008 WL 60279 *5. In this case, Doe clearly opposed discriminatory actions at work, taken by Mike and Painter, persons in his

---

[61] Ex. 3 [30(b)(6) Dep. (Chapman) 43:1-9; 43:21-23; 44:1-2]

supervisory chain of command and holding higher positions of authority with the Defendant than Doe. Moreover, Defendant received Doe's complaints as complaints against the employer because Chapman, the leading human resources official for the employer, disciplined Mike and Painter for their conduct against Doe.

Moreover, the Eleventh Circuit provides that even if conduct complained about is not unlawful, a plaintiff can establish a *prima facie* case of retaliation under Title VII if he had "**an objectively reasonable belief that he opposed an unlawful employment practice.**" *Little, supra,* 103 F.3d at 960, *supra*, and *Brown, supra*, 261 Fed. Appx. at 174, 2008 WL 60279 *5. Thus, Doe "**must not only show that he *subjectively* (that is, in good faith) believed that Defendant engaged in unlawful employment practices, but also that his belief was *objectively* reasonable under the circumstances.**" *Little, supra,* 103 F.3d at 960, and *Brown, supra*, 261 Fed. Appx. at 174, 2008 WL 60279 *5.

• **Subjective Good Faith**. Doe presents ample evidence showing he had a reasonable basis for a subjective good faith belief that he took part in statutorily protected expression. *See Clover v. Total Sys. Serv., Inc.,* 176 F.3d 1346, 1351 (11th Cir.1999)(protected expression element satisfied where court had no reason to doubt plaintiff did not have a good faith, reasonable belief he was engaging in

statutorily protected expression). *Brown, supra*, 261 Fed. Appx. at 174, 2008 WL 60279 *6.

Doe's understanding of Defendant's Sexual Harassment Policy supports his subjective good faith belief that Defendant engaged in unlawful discriminatory harassment. In response to Defendant's counsel, Doe testified:

Q.   Here is my question and it's really not that difficult.  This policy is entitled, "Sexual and Other Unlawful Harassment," correct?

A.   Correct.

Q.   **Did you understand that McPherson prohibited unlawful harassment based upon this policy?  Did you understand that**? [Emphasis supplied].

A.   Yes.

Q.   **And you believed, did you not, that the comments made by Randy Painter and Michael McPherson were unlawful harassment**?  Is that what you believed at some point? [Emphasis supplied].

A.   Yes.[62]

In addition, Tipton, Doe's direct supervisor, admits Doe informed him that he had contacted an attorney concerning his legal rights.[63] Also, Chapman, in the 30(b) (6) deposition and in her second, individual deposition, vividly recalled countless events; however, she provided the following testimony concerning whether Doe informed her that he had retained counsel:

---

[62]   Ex. 5   [Dep. (Doe) 379:18-380:8]
[63]   Ex. 6   [Dep. (Tipton) 79:4-10]

> Q.     In one of your conversations with [Doe], did he mention that he had retained a lawyer regarding his employment issues?
>
> A.     I don't recall.[64]

Moreover, Doe directly confronted Mike and objected to the comments made by Mike and Painter and stated the comments needed to stop.[65] Furthermore, Doe met with Chapman on approximately three-four occasions, and Doe raised his complaints about the harassment he was facing from Mike and Painter, persons above him in the supervisory chain of command.

Accordingly, based on the above cumulative facts, Doe's good faith belief was objectively reasonable because a detached person, viewing the evidence in a cumulative manner, could have easily interpreted such evidence as an indication Defendant engaged in an unlawful employment practice.

• **<u>Objectively Reasonable</u>**. Doe meets the requirement that his good faith objective belief that Defendant was violating the law was <u>objectively reasonable in light of the facts and record presented</u>. *Little, supra,* 103 F.3d at 960. Doe's belief was objectively reasonable because Defendant disciplined Mike and Painter for unlawful discrimination. Defendant, through Chapman, admits in testimony:

> Q.   . . . . Anyone found to be engaging in any type of **<u>unlawful discrimination</u> will be subject to disciplinary action up to and including termination of employment**? Do you see that?

---

[64]     Ex. 3  [30(b)(6) Dep. (Chapman) 57:6-57:10]
[65]     Ex. 7  [Dep. (Mike) 70:11-17]

A.    Yes.

Q.    Was that the type of discipline that McPherson Companies imposed on Randy Painter and Mike McPherson?

A.    Yes.[66]

Moreover, the nature of Defendant's discipline on Mike and Painter is crucial. Mike and Painter were Defendant's managers. The nature of their offense was sufficiently severe to warrant discipline by high-level officials of Defendant: (1) Chapman, Human Resources Director for all of Defendant's operations; and (2) Brad Gray, Defendant's Executive Vice President.[67] The discipline imposed on Mike and Painter included an admonishment that any form of unprofessional conduct or harassment was not tolerated and disciplinary action up to and including termination could occur.[68]  Furthermore, Defense counsel, in examining Doe, essentially admits that Defendant considers the type of conduct by Mike and Painter to be unlawful discrimination. Defendant's examination of Doe:

Q.    Here is my question and it's really not that difficult. This policy is entitled, "Sexual and Other Unlawful Harassment," correct?

A.    Correct.

Q.    **Did you understand that McPherson prohibited unlawful harassment based upon this policy?  Did you understand that**? [Emphasis supplied].

---

[66]    Ex. 3 [30(b)(6) Dep. (Chapman) 113:4-13]
[67]    Ex. 3 [30(b)(6) Dep. (Chapman) 19:23; 60:1-10; 60:19-23; 61:1-3]
[68]    Ex. 3 [30(b)(6) Dep. (Chapman) 19:23; 60:1-10; 60:19-23; 61:1-3]

A.     Yes.

Q.     **And you believed, did you not, that the comments made by Randy Painter and Michael McPherson were unlawful harassment**?  Is that what you believed at some point? [Emphasis supplied].

A.     Yes.[69]

### (b)    Second Prong: Materially Adverse Action

Doe suffered a material adverse employment action by his involuntary discharge from employment on February 8, 2008. This action occurred after his complaints to Chapman concerning the sexual harassment, as outlined above.

### (c)    Third Prong: Causal Connection

Third, Doe establishes the requisite causal connection exists between his protected conduct and the materially adverse action of discharge. The Eleventh Circuit construes the causal link element <u>broadly</u> so that "**a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated**." *Goldsmith v. Bagby Elevator Co.,* 513 F.3d 1261, 1277 (11th Cir.2008), quoting *Olmsted v. Taco Bell Corp.,* 141 F.3d 1457, 1460 (11th Cir.1998)(quoting *EEOC v. Reichhold Chems., Inc.,* 988 F.2d 1564, 1571-72 (11th Cir.1993))(internal quotation marks omitted). *Simmons v. Camden County Bd. of Educ.,* 757 F.2d 1187, 1189 (11th Cir.1985) explains:

We do not construe the "causal link" in the [retaliatory discharge] formula to be the sort of logical connection that would justify a prescription that the

---

[69]     Ex. 5 [Dep. (Doe) 379:18-380-8]

protected participation in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the defendant.

*Pears v. Mobile County*, 645 F.Supp.2d 1062, 1096 (S.D.Ala. 2009), explains that temporal proximity is not the only means by which a plaintiff can establish a causal connection. To the contrary, courts have routinely found a causal connection even as to retaliatory acts occurring long after the protected activity, where a chain of intervening retaliatory acts links those events. *See, e.g., Bass v. Board of County Commissioners,* 256 F.3d 1095, 1117-19 (11th Cir. 2001) (deeming causal connection element satisfied even though adverse action occurred more than one year after EEOC charge, where retaliatory acts commenced shortly after charge was filed); *Wideman v. Wal-Mart Stores, Inc*., 141 F.3d 1453, 1457 (11th Cir.1998)(causal connection requirement satisfied where "the series of adverse employment actions commenced almost immediately after management learned she had filed the charge"); *Odom v. Mobile Infirmary*, 2008 WL 748398, *10 (S.D. Ala. Mar. 17, 2008)(causal connection element established even though plaintiff was fired seven months after protected activity, where "the chain of retaliatory treatment commenced immediately after she complained").

In this case, Defendant admits Doe met with Chapman on October 30 or 31, and two or three times thereafter. Doe's communicated his complaints to Chapman. Chapman shared the complaints with Bedford, Vice President of

Operations, and with Gray, Executive Vice President. Gray knew of the complaints because Gray and Chapman made the decision to counsel verbally Mike and Painter for the conduct at issue in the complaints. Thus, Bedford, Gray, and Chapman knew of Doe's complaints prior to Doe's discharge.

Doe's meetings with Chapman were contemporaneous with, or followed by, a linked chain of intervening events. First, Defendant admits that on or after the first meeting between Doe and Chapman, Painter asked Chapman when Defendant should send Doe to his random drug test.  Such action is suspicious because: (1) if a test is random, why would there be the need to select the date to take the test?; (2) this "random" drug test occurred in conjunction with Doe's first meeting with Chapman to discuss his employment issues; and (c) while Chapman did not recall when Doe's prior drug test occurred; Doe was only tested by Defendant on one other occasion, which was virtually (4) years earlier in his pre-employment drug test.  Painter admitted he had no reason to doubt that such drug testing scenario was accurate.

Second, Defendant created a situation resulting in Doe not working for two days without pay. Even if Defendant offered this arrangement and Doe accepted, at such point, Doe was not in any realistic position to challenge Chapman because he was seeing her to address the harassment he was confronting. Third, when Doe returned to work, Defendant had altered his duties. Fourth, on January 22, 2008,

Doe received his first written disciplinary action; an Employee Counseling Report for absenteeism, and a first written warning. Defendant did not provide Doe any progressive discipline such as a Report with a verbal warning. Thereafter, on February 8, 2008, Defendant discharged Doe, approximately 17 days after receiving his first written disciplinary action. Again, Defendant denied him the benefit of progressive discipline, after his discipline on January 22, 2008 and prior to his discharge on February 8, 2008, contrary to Defendant's own practices. For example, Defendant did not provide him with the following available steps which Defendant had provided to other employees who retained their positions, such as a: (a) second written warning; (b) suspension; and (c) final written warning.

### 2.    Pretext: Retaliatory Discharge

The Commission establishes pretext by Defendant, concerning the retaliatory discharge of Doe. The cumulative and conflicting evidence provided by Defendant concerning multiple reasons for its actions establishes pretext.

*Not a single reason provided by Defendant, to support Doe's discharge, is consistent and/or credible with Defendant's own evidence, policies, and practices.*

Concerning pretext, *Brown v. Chertoff,* 563 F.Supp.2d 1372, 1378-1379 (S.D.Ga.,2008), states:  "To adequately show pretext, an employee must cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a

reasonable fact finder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct. In other words, he must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." [Internal quotations omitted].

**The Commission establishes pretext by presenting sufficient evidence to show that the proffered reasons were not the real reason for the adverse employment action and that the real reason was retaliation**. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993). The EEOC demonstrates McPherson's multiple proffered reasons were not the true reasons by indirectly establishing to the Court that a retaliatory reason more likely motivated the employer and/or indirectly by showing that Defendant's employer's proffered reasons are unworthy of credence. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256, (1981).

### (a) *Timing of Doe's Single Disciplinary Action and Discharge*

Defendant provided Doe a single Employee Counseling Report (disciplinary action) on January 22, 2008. This action was a first written warning for absenteeism. This action was taken only after: (i) Doe had complained of the harassment to Chapman; (ii) informed Tipton that he had talked to an attorney concerning his working conditions; (iii) been subjected to an alleged random drug

test on or the day after his meeting with Chapman; and (iv) been required to take off work for (2) two days without pay.

The January 22, 2008, disciplinary action was approximately 17 days prior to Defendant's discharge on February 8, 2008. Pursuant to McPherson's practice and policy of using the Employee Counseling Report concerning other employees, this single action, a first warning, does not support Doe's discharge.

Critically, in the period between January 22, 2008-February 8, 2008, Defendant did not issue Doe any Employee Counseling Report. Thus, Defendant cannot establish why it selected Doe to be discharged on February 8, 2008. Moreover, Defendant cannot cite a single credible event, between January 22, 2008 and February 8, 2008 to support Doe's discharge. First, there is no evidence of any disciplinary action against Doe in this period. Second, to the extent Defendant asserts it provided Doe verbal warnings, such position is without merit because Defendant's established practice is to use the Employee Counseling Report for verbal warnings, as discussed above concerning SUPERVISOR # 1. Third, Tipton admits that he never provided Doe with a Report consisting of a verbal warning.

### (b)   *Defendant's Critical Admissions*

Doe received a single written warning and he was discharged. Defendant's own Manager cannot understand this decision. The penalties received by this MANAGER and SUPERVISOR # 2 include a one-day suspension, a two-day

suspension, and a final warning. The MANAGER admits such actions are more severe disciplinary actions than Doe received on January 22, 2008, a first written warning. Significantly, this MANAGER cannot explain why he received two suspensions, each one greater in length, and a final warning and kept his job, while Doe received a single Employee Counseling Report, a first written warning, and lost his job.[70]

Tipton, Doe's direct supervisor, did not sign the January 22, 2008 Report; it was signed by Painter, Doe's third-level supervisor. Tipton admits he supervised Doe from September 9, 2005 until Doe's discharge on February 8, 2008. During this period, Tipton had the authority to issue Employee Counseling Reports to Doe. Tipton admits that during such period, he **never** issued any Report to Doe for any of the following forms of misconduct: (1) tardiness; (2) quality of work; (3) quantity of work, (4) insubordination; (5) policy violation; (6) safety; or (7) other type of misconduct, or issued any verbal warning to Doe on any Report.

### (c)    *Defendant's Arbitrary Use of Disciplinary Process*

Defendant verbally counseled Mike and Painter for actions that Chapman describes as **unlawful discrimination** in their treatment of Doe.[71] Yet, Defendant retained Mike and Painter, and did not issue them Employee Counseling Reports.

---

[70] Ex. 7 [Dep. (Manager and Supervisor # 2) 37: 3-23; 38:1-15]
[71] Ex. 3 [30(b)(6) Dep.   (Chapman) 113:4-13]

In contrast, Defendant discharged Doe, the person who opposed discrimination and who was the target of Mike and Painter's unlawful discrimination.

Defendant did not discharge any other employee for an offense of a first written warning on the Employee Counseling Report used by Defendant. As set forth in detail above, Defendant issued the following disciplinary actions to employees and every employee retained their position and was not subjected to any discharge or reduction in force: (1) verbal warning to Supervisor # 1; (2)  a one-day suspension, a two day suspension, and a final warning to MANAGER and SUPERVISOR # 2; and (3) a first written warning for tardiness to WAREHOUSE WORKER # 1, who was not discharged, and after he resigned, Defendant offered him a position at a greater amount of pay to return and he accepted.

### (d)    *Defendant's Contradictory Identification of Decision Maker*

Defendant's key officials <u>cannot agree</u> as to the identification of the decision maker for the decision to discharge/lay off Doe. Defendant asserts multiple distinct decision makers. First, Mike Bedford, Vice President of Operations, testified that **he was the** decision maker[72] to end Doe's employment, the "management executive committee" that Chapman asserts made the decision. Second, Defendant, via Chapman, testified that "we determined" Doe's employment would be terminated, referring to the management team consisting of herself, Brad Gray,

---

[72] Ex. 4 [Dep. (Bedford) 13:20-23; 14:1-5]

Mike Bedford, and Ken McPherson.[73] Finally, Tipton testified Painter and Chapman made the decision to discharge Doe.[74]

### (e)   *Defendant's Inconsistent Reasons for Discharge*

### • **Bedford's Process and Reasons for Discharging Doe**.

Bedford asserts he was the decision maker to end Doe's employment. Bedford's alleged reasons are deficient because the record contradicts them. First, Bedford did not even know Doe's title. Bedford testified:

> Q.     So what would have been [Doe's] specific job title prior to making the complaints to Anna Marie Chapman?
> . . . .
>
> A.     I don't have an answer for that.[75]

Second, Bedford was unaware Lamar Tipton was Doe's direct supervisor.[76] Third, Bedford was unfamiliar with Doe's disciplinary history because he was unaware that Doe had only received one written disciplinary action and he was unaware of the number of times Doe had been "written-up."[77] Bedford was not aware of Doe ever receiving any disciplinary action more severe than a first written warning.[78] Moreover, Bedford was unaware of any written document disciplining Doe other

---

[73]     Ex. 9    [Dep. # 2 (Chapman) 16:7-3]
[74]     Ex. 6    [Dep. (Tipton)  94:18-22]
[75]     Ex. 4    [Dep. (Bedford) 49:1-6]
[76]     Ex. 4    [Dep. (Bedford) 62:8-12]
[77]     Ex. 4    [Dep. (Bedford) 37: 6-11; 55:10-13]
[78]     Ex. 4    [Dep. (Bedford) 39:1-4]

than the January 22, 2008 Report.[79] Fourth, Bedford alleges he consulted with Painter concerning Doe's discharge, including "who we were going to let go."[80] Bedford contends Painter gave him guidance and feedback concerning Doe and the layoff. [81] In contrast, Painter testified Bedford made the decision to lay off Doe and picked Doe, and Painter was not involved.[82] Also, prior to February 8, 2008, when Bedford and Chapman informed Doe that he was being discharged, Painter had not discussed with Bedford "the fact that [Doe] was no longer going to be employed at McPherson."[83]

Fifth, Bedford alleges he reviewed Doe's performance evaluations and such review was the basis for Doe being laid off. [84] Bedford asserts the evaluations revealed "tardiness, lack of productivity, his personal issues being brought to work, and that sort of thing."[85] However, Bedford does not recall whether such items were in Doe's performance evaluations, stating: "I don't recall. I believe -- just from this time period of four years, I just don't recall the specifics of what was in his evaluation."[86] Bedford testified:

Q.     And is that the process that you followed in evaluating [Doe's] performance when you were considering him for part of the reduction in force?

---

[79]     Ex. 4   [Dep. (Bedford), 64:17-22]
[80]     Ex. 4   [Dep. (Bedford) 24:9-23; 25:1]
[81]     Ex. 4   [Dep. (Bedford), 107:22-23; 108:1-8]
[82]     Ex. 8   [Dep. (Painter), 66:18-21; 82:16-19; 82:23; 83:3-4]
[83]     Ex. 8   [Dep. (Painter),  67:10-21]
[84]     Ex. 4   [Dep. (Bedford)  38:9-21]
[85]     Ex. 4   [Dep. (Bedford)  38:9-21]
[86]     Ex. 4   [Dep. (Bedford)  38:22-23; 39:1-4]

A.     Absolutely. It specifically had to do with his performance, his tardiness, his productivity, his attitude, all those came into play, and really his fit and his job skill set is really what I'm trying to state.[87]

Sixth, Bedford alleges Doe received disciplinary actions for tardiness and lack of productivity, but not improper statements. [88]

The Commission asserts that such items were not in any of Doe's performance evaluations and Doe never received any Employee Counseling Report concerning any of these alleged issues.

### •Management Team's Process and Reasons for Discharging Doe.

Defendant's management team provides a process unworthy of credence and reasons for Doe's discharge that conflict with Defendant's records and policies. The team provides inconsistent and unsupportable versions of the reasons for Doe's discharge.

Defendant's management team, prior to making the decision to end Doe's employment, did not review his: (a) personnel file; (b) performance evaluations; [89] or (c) disciplinary file.[90] The team, prior to making the decision to end Doe's employment, did not rank any of the employees who would be subject to any reduction in force.[91] Thus, Defendant's team did not engage in a good faith

---

[87]     Ex. 4     [Dep. (Bedford), 105:15-23]
[88]     Ex. 4     [Dep. (Bedford)  51:19-23]
[89]     Ex. 9     [Dep. # 2 (Chapman) 14:9-14:15]
[90]     Ex. 9     [Dep. # 2 (Chapman) 17:2-13]
[91]     Ex. 9     [Dep. # 2 (Chapman) 16:12-15]

process, as required by *Sharpe, supra*, 766 F.Supp.2d at 1303, to determine why **this particular worker**, Doe, was selected for discharge/lay-off. Finally, Defendant's team discharged Doe because he was having performance issues, attendance issues, and inconsistency in his job performance and his performance did not meet expectations.[92]

Critically, every reason conflicts with Doe's disciplinary record and Doe's performance record, as reflected in his evaluations and lack of Employee Counseling Reports on any aspects of job performance. The Report provides for a McPherson employee to be disciplined for job performance by such factors as: (a) quality of work; (b) quantity of work; (c) insubordination; (d) policy violation; or (e) other. Doe never received any Report on any of these issues. Furthermore, any allegation Doe was terminated because of any performance issue is without merit because Defendant never indicated any performance deficiencies in any of Doe's performance evaluations. Also, all of Doe's performance evaluations were at the level of "meets expectations" or higher.

**Summary Judgment Standard**

There are a number of important principles that must guide the Court in ruling on summary judgment. Perhaps the broadest and farthest-reaching principle is that the evidence presented to the court on a summary judgment motion is

---

[92]     Ex. 9    [Dep. # 2 (Chapman) 19:8-10]

always construed in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986); *Crawford v. Carroll,* 529 F.3d 961, 964 (11th Cir. 2008). This principle has a number of important implications and applications:

First, all of the non-moving party's evidence must be believed, *Stewart v. Booker T. Washington Insurance,* 232 F.3d 844, 850 (11th Cir. 2000), and those facts must be viewed in the light most favorable to the plaintiff as the non-moving party. *Coker v. Morris*, 2008 WL 2856699 *4 (N.D. Fla. 2008).

Second, all reasonable factual inferences must be drawn in favor of the party opposing summary judgment. *Crawford v. Carroll,* 529 F.3d 961, 964 (11th Cir. 2008). This means, for example, that summary judgment must be denied, even where the parties agree on the basic facts, if reasonable minds might differ on the inferences arising from those undisputed facts.  In such a case, the court must draw the inferences favorable to the non-moving party and deny summary judgment. *Burton v. City of Belle Glade,* 178 F.3d 1175, 1187 (11th Cir. 1999); *Mills v. Innovative Energy Global, Ltd.,* 2011 WL 1299938 *5 (N.D. Fla. 2011)(summary judgment is inappropriate where "divergent ultimate inferences may reasonably be drawn from the undisputed facts.").

Third, all reasonable doubts about the facts must be resolved in favor of the party opposing summary judgment. *Sledge v. Goodyear Dunlop Tires North*

*America Ltd.,* 275 F.3d 1014, 1019 (11th Cir. 2001); *Clemons v. Dougherty County,* 684 F.2d 1365, 1368-69 (11th Cir. 1982).

Another important principle that directs trial courts at summary judgment is that the moving party's evidence is treated with skepticism. The court must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Thomas v. The Great Atlantic and Pacific Tea Company, Inc.,* 233 F.3d 326 (5th Cir. 2000)*; Haves v. City of Miami,* 52 F.3d 918, 921 (11th Cir. 1995)*; Reeves v. Sanderson Plumbing Products Co.,* 530 U.S. 133 (2000)*.* Specifically, summary judgment is not appropriate when the evidence could permit the trier-of-fact to treat the movant's testimony with "skeptical scrutiny." *Deville v. Marcantel,* 567 F.3d 156, 165 (5th Cir. 2009).

"On summary judgment, the court's function is not to weigh the evidence to determine the truth of the matter, but to determine whether a genuine issue of fact exists for trial." *Stallworth v. Okaloosa County School District,* 2011 WL 4552187 * 7 (N.D. Fla. 2011).

Ultimately, a motion for summary judgment should not be granted "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." *Campbell v. Hewitt , Coleman & Associates, Inc.,* 21 F.3d 52, 55 (4th Cir. 1994). "[A]ny doubt as to the existence of a genuine issue of

material fact will be resolved in favor of denying the motion." *Howard v. BP Oil Co., Inc.,* 32 F.3d 520, 524 (11th Cir. 1994). *See also Gross v. Southern Railway Co.,* 414 F.2d 292 (5th Cir. 1969) (All doubt as to the existence of a material fact must be resolved against the party moving for summary judgment).

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS**

## I.      DEFENDANT'S STATEMENT OF UNDISPUTED FACTS.[93]

The law is clear: a party may not rely on non-admissible evidence to support a motion for summary judgment. *Sharpe v. Global Sec. Intern.,* 766 F.Supp.2d 1272, 1281 (S.D.Ala.2011), *citing, Rowell v. BellSouth Corp.,* 433 F.3d 794, 800 (11th Cir.2005) ("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form.").

### A.      Doe's Employment with McPherson from 2004-2006.

1.      Plaintiff **admits**: (a) Doe was hired on August 16, 2004 and a document in his personnel record states his position as lead tech/driver in the Renew department ["Renew"]; (b)  Renew recycled oil-based products; and (c) Doe understood in Renew that as a part of his job responsibilities, he would come

---

[93] [Defendant's Brief, p. 3, para. 1] Defendant states: "McPherson disputes several of the facts in this statement, particularly related to the comments Doe contends he was subjected to, the persons to whom he complained and the substance of his purported complaints. However, for purposes of this summary judgment motion, the Court may assume these facts are undisputed."[93]

into contact with hazardous materials.[94] Plaintiff **disputes** Doe performed the actual position of lead/tech driver because Defendant hired as him Supervisor over Renew, he supervised employees, and he never heard himself referred to as lead tech/driver in the Renew department.[95]

2.    Plaintiff **admits** Doe's job duties included operating several machines in Renew which cleaned and recycled oil.[96]

3.    Plaintiff **admits** Doe was responsible for cleaning floors in Renew when he was Supervisor of Renew.[97] Plaintiff **disputes** that Doe, prior to submitting internal complaints of the sexual harassment from Mike and Painter to Tipton, Mike, Painter, and Chapman, and prior to his removal from his Supervisor position, was responsible for cleaning floors for the entire right-hand side of the warehouse and cleaning totes.[98]  Doe's duties as Supervisor included performing the tank inventory, watching the machines, pulling the filters, and cleaning oil; and Doe's testimony does not support the alleged fact he operated fork lift during his role as Supervisor of Renew.[99]

4.    Plaintiff **admits** Painter complained to Doe several times that the floors in Renew Department were messy. Plaintiff **disputes** Doe was ever

---

[94]  Defendant's Brief, p. 3, para. 1.
[95]  Ex. 5  [Dep. (Doe)  103:9-23]
[96]  Ex. 5  [Dep. (Doe)  111:21-23; 112:1015; 113: 18-23]
[97] Ex. 5  [Dep. (Doe)  222: 2-18]
[98] Ex. 5  [Dep. (Doe)  300:2-4]
[99] *Id*.

disciplined for any such conduct because there is no evidence of any such discipline.

5.      Plaintiff **admits** during Doe's service as Supervisor, he performed a project involving off-site work which entailed traveling to a customer's plant and pumping oil out of the customer's tanks and reservoirs onto a McPherson truck. Plaintiff **disputes** that Defendant's citation to Doe's deposition (Doe 181:1-184:14)[100]; references any language concerning Defendant's aforementioned allegation. In addition, Plaintiff objects to Scott Wamble's deposition testimony as inadmissible hearsay. Moreover, Plaintiff **disputes** Wamble's reference to Doe's position description because there is not any foundation for Wamble to have knowledge of any job description given to Doe. Finally, Plaintiff **disputes** Wamble's allegation because Defendant never gave Doe a job description.[101]

6.      Plaintiff **disputes** that Doe, prior to submitting internal complaints of sexual harassment from Mike and Painter to his supervisors and Chapman, and prior to his removal from his Supervisor position, was subject to any set schedule in Renew during his service as Supervisor. [102]

7.      Plaintiff **admits** Robert Whone ("Whone") was Doe's direct supervisor when Defendant first hired Doe.

---

[100] Ex. 5  [Dep. (Doe)  111:21-23; 112:1-15; 113:8-23]
[101] Ex 16 [Doe Declaration, p. 2, para.6]
[102] Ex. 5 [Dep. (Doe)  308:10-18]

8.     Plaintiff **admits** that Whone, after Doe was hired, requested Doe obtain a CDL and Doe never obtained a CDL. Plaintiff **disputes** Doe refused to drive large trucks; rather, Doe explained to Whone that under no certain terms did he want to be in a big truck; and Whone's response to Doe was that he did not have a problem concerning this issue and Whone informed  Doe that Whone  would hire Doe drivers to do all the driving.[103]

9.     Plaintiff **admits** the Renew department is located in the McPherson warehouse.

10.     Plaintiff **admits** Painter was the Facility Operations Manager during Doe's employment.

11.     Plaintiff **admits** that in the fall of 2005, Defendant had a reorganization of positions, resulting in changes in the chain of command for employees who worked in the warehouse.

12.     Plaintiff **admits** that as of September 19, 2005: (a) Doe reported directly to Lamar Tipton, Renew Blend Supervisor.[104] Plaintiffs' **disputes** any allegation that Doe's chain of supervisory and reporting chain of command consisted of any supervisory chain other than the following, which Defendant **admits**: Tipton reported to Mike, Assistant Operations Manager; Mike reported to

---

[103] Ex. 5  [Dep. (Doe)  113:16-114:1-4]
[104] Ex. 6  [Dep. (Tipton)  20:4-9]

Painter, Facility Operations Manager;[105] and Painter reported to Bedford, Vice President of Operations. [106]

13.     Plaintiff **admits** Mike was over "lubes" or the new oil distribution side and **admits** Mike did not directly supervise Doe. Plaintiff **disputes** that Mike did not serve as Doe's second level supervisor because Defendant admits Mike served as Doe's second level supervisor, with the authority to:  (a) take disciplinary action against Doe; and (b) direct Tipton to take disciplinary action against Doe. Plaintiff **disputes** that Mike did not have substantial authority over Doe's employment because Defendant admits Mike had the aforementioned supervisory authority.

**B.      McPherson's Anti-Harassment Policy and Reporting Procedures.**

14.     Plaintiff **admits** that on or about August 11, 2004, Doe acknowledged his receipt of the employee handbook and Defendant's policy prohibiting sexual and other unlawful harassment, he reviewed the handbook and did not have any questions regarding any policy. Plaintiff **disputes** that Doe ever received any training concerning the employee handbook and Defendant's harassment policy.[107] Also, Plaintiff **disputes** that anyone working for Defendant, including Tipton, Mike, Painter, or Chapman, ever discussed or explained the handbook and policy with him, including any prohibition of sexual harassment and  retaliation, how to

---

[105] Ex. 7  [Dep. (Mike)   13:19-14:16; 15:22-16:1-9]
[106] Ex. 3   [Rule 30(b)(6) Dep. (Chapman) 30:2-6]
[107] Ex 16  [Doe Declaration, p. 1, para. 3-4 ]

report an internal complaint of harassment, or retaliation, and Defendant's process for resolving such internal complaints. [108]

15-16. Plaintiff **asserts** the facts alleged in paragraphs 15 and 16 are substantially identical and cumulative to the facts admitted in the aforementioned paragraph 14.

17.    Plaintiff **admits** Doe testified that he understood if he had any sexual harassment complaints, he could report them to his supervisor and to McPherson's Human Resources Manager.

18.    Plaintiff **admits** Doe testified that he understood employees who violated the harassment policy would be subject to discipline

19.    Plaintiff **admits** Doe testified that he understood Defendant would not retaliate against employees who reported harassment.

20.    Plaintiff **admits** Doe was aware McPherson's anti-harassment policy was posted in the break room.

21.    Plaintiff **admits** Doe read the policy posted in the break room.

22.    Plaintiff **admits** that on or about January 11, 2005, Doe acknowledged his receipt of the revised McPherson Employee Handbook.

23.    Plaintiff **admits** Doe reviewed McPherson's anti-harassment policies on at least three occasions.

---

[108] *Id.*

### C.    The Horseplay Environment and Alleged Harassment

24.    Plaintiff **disputes** that Doe engaged in horseplay with his co-workers at work. Plaintiff **admits** that Doe testified to the point that he would "kid around with other employees and joke around with other employees." [109]

25.    Plaintiff **admits** Doe may have called Merrell Smith "fathead' and called Eric Beasley "fat." Plaintiff **disputes** that Defendant's citation to a specific portion of Doe's testimony (Doe Depo. at pp. 270:6-271:10) does not reference any comments made by Doe to any employees.

26.    Plaintiff **admits**  Smith called Doe "queer" and "homo" and Beasley called Doe "fag" and "queer".

27.    Plaintiff admits Doe testified that he started to be sexually harassed, six to eight months after he started working for Defendant in August 2004; such period between February of 2005 and April of 2005.

28.    Plaintiff **admits** Doe testified the harassment began because the people Doe worked with on a daily basis became more familiar with him and started making derogatory comments to him, building and escalating as the months went by  and Mike called him a faggot because Mike had reached a comfort level

---

[109] Ex. 5  [Dep. (Doe)  217:1-9]

with Doe that he thought such comments were okay. Doe testified that he does not know why Mike would reach such level with him.[110]

29.     Plaintiff  **admits**  Doe  testified  that  the  first  comment  occurred sometime between February of 2005 and April of 2005 when Mike referred to Doe as "faggot."

30.     Plaintiff **admits** Doe would kid around with Mike. When he and Mike were climbing on top of tanks, Mike would rock the tanks back and forth to scare Doe because Mike knew that Doe was intimidated by the height and Doe was "terrified." Doe "may have-I rocked the tanks back."[111]

31.      Plaintiff **objects** to this allegation on the basis of relevance, and the allegation is neither genuine nor material.  Doe spit the tobacco juice from dipping in Mike's trash can next to his desk. Plaintiff **asserts** Doe knew that "everybody" spit in [Mike's] trash can, [112] and Mike never told Doe to stop such behavior.[113] Moreover, Plaintiff **objects** to this allegation because Defendant's cites a specific portion of Doe's deposition which does not address any trash can or spitting issue; to-wit: citing (Doe Depo. at p. 124:2-10).

---

[110] Ex. 5 [Doe Dep. 204:7-11;  205:11-23; 206:1-5]
[111] Ex. 5 [Doe Dep. 207:11-23; 208:1-7.]
[112] Ex. 5 [Doe Dep. 213:7-14]
[113] Ex. 5 [Doe Dep. 214:8-14]

32.    Plaintiff **admits** that he tried to "rag pop" Mike by taking a rag and popping it at Mike. [114] Plaintiff **admits** Doe joked around with co-workers Smith, Beasley, Daniel Miller and Heath Michaels by rag popping each other.[115]

33.    Plaintiff **admits** that after Mike's first reference to Doe as "faggot" in 2005, Doe contends Mike made similar comments to him every day or every other day. Plaintiff **admits** such comments included: "come here, fag," "hey homo," "look who's here, dick sucker," and "why does your breath always smell like ass?" Plaintiff **disputes** Mike's harassing statements to Doe and/or about Doe were limited to the above statements in Defendants allegation in this paragraph.[116]

34.    Plaintiff **admits** on September 25 or 26, 2007, Mike said to him: "All anybody has got to do is pull their pants down and, poof, there you are ready to suck their dick" and ""hurry, everybody, get your pants up, here's John, he'll start sucking your dick". Plaintiff **disputes** Mike's harassing statements to Doe and/or about Doe were limited to the above statements in Defendants allegation in this paragraph.[117]

35.    Plaintiff **admits** that sometime between February and April of 2005, Painter commented to Doe when he walked into Painter's office: "Okay faggot. Here's what I want you to do." Plaintiff **disputes** that Painter's harassing

---

[114] Ex. 5 [Doe Dep. 209:7-14]
[115] Ex. 5 [Doe Dep. 209:7-14]
[116] Ex. 5 [Doe Dep. 358:4-18]
[117] *Id.*

statements to Doe, and/or about Doe, were limited to the above statements in Defendants allegation in this paragraph.[118]

36.     Plaintiff **admits** that one time Painter said something along the lines of: "Hey, faggot, you know you ain't supposed to be wearing flip-flops in the warehouse." Plaintiff **admits** Doe testified that he does not know when this comment occurred. Plaintiff **disputes** Painter's harassing statements to Doe and/or about Doe were limited to the above statements in Defendants allegation in this paragraph.[119]

37.     Plaintiff **admits** that on October 18, 2007, Painter said to him: "What, is the battery dead on your butt plug going dead?" and "I swear, that boy can't do nothing without something shoved up his ass." Plaintiff **disputes** Doe testified that Painter made such comment only on October 18, 2007; because Doe testified that such comment occurred on _____.[120] **???** Plaintiff **disputes** Painter's harassing statements to Doe and/or about Doe were limited to the above statements in Defendants allegation in this paragraph.[121]

38.     Plaintiff **admits** Doe alleges Painter told him "you know what this is, that's a nut and you've had several nuts in your mouth" after Doe asked him about a jar of peanut oil sitting on Painter's desk.  Plaintiff **admits** that Doe ate pistachios

---

[118] *Id.*
[119] Ex. 5 [Doe Dep. 358:4-18]
[120] *Id.*
[121] *Id.*

and sunflower seeds at work. Plaintiff **disputes** that Tipton and Painter Doe for making a mess with the shells because Doe does not recall any such conversation.[122]   Plaintiff **disputes** Painter's harassing statements to Doe and/or about Doe were limited to the above statements in Defendants allegation in this paragraph.[123]

39.   Plaintiff **admits** Painter made other comments to Doe, including: "faggot," "queer," "homo," "dick sucker," "fairy," "ass breath," and "go behind the tank and do what [you] do to men." Plaintiff **disputes** Painter's harassing statements to Doe and/or about Doe were limited to the above statements in Defendants allegation in this paragraph.[124]

40.   Plaintiff **admits** no one ever physically touched Doe when he was working at Defendant.

41.   Plaintiff **admits** Doe did not feel physically threatened by any of the comments made to him.

42.   Plaintiff **disputes** Mike and Painter called any other employee fag, faggot, and queer because Doe never heard such statements to other employees.[125]

43.   Plaintiff **objects** to the following allegation because it is inadmissible hearsay because Wamble is the source of the alleged statement by Painter.

---

[122] Ex. 5 [Doe Dep.  244:7-10; 246:14-23; 247:1-5; 358:4-18] .
[123] Ex. 5 [Doe Dep. 358:4-18]
[124] *Id.*
[125] Ex. 5 [Doe Dep. 210:15-23; 211:1-4].

44.     Plaintiff **objects** that comments made among the employees were made in a joking manner and were not intended to degrade anyone. Also, Plaintiff **objects** to this allegation as inadmissible hearsay because Mike is testifying about unspecified comments, made by unidentified employees and he is testifying to the state of mind of such unidentified employees when they allegedly made the unspecified comment. Moreover, Plaintiff **objects** to this allegation because it is vague, and confusing because the allegation does not specify the comments at issue, identify who the employees were in the allegation.

45.     Plaintiff **admits** Doe testified that he did not carry himself like a woman when he worked for Defendant; he was "just as much of a man as anyone else": and he gave off that impression to his coworkers.

46.     Plaintiff **admits** Painter testified that did not view Doe as being feminine.

47.     Plaintiff **admits** Mike testified that he did not view Doe as being feminine or different in appearance than the other men who worked in the warehouse

48.     Plaintiff **admits** Tipton testified that he did not think Doe looked or carried himself differently than the other male employees who worked in the warehouse.

49.   Plaintiff **admits** at the time Doe worked for Defendant, he was 5'10" and weighed between 190 and 220 pounds and had tattoos on his arms.

50.   Plaintiff **admits** Doe testified that two other men at Defendant's workplace wore earrings and Doe was aware of Defendant's dress code. Plaintiff **disputes** the remaining allegation because Defendant's citations to Doe's deposition do not support the allegation that he dressed like the other male employees who worked in the warehouse and they all wore the same uniforms and complied with the dress code. Defendant's cite: (Doe Depo. at pp. 272:12-15). (Doe Depo. at pp. 274:15-275:19 ).

51.   Plaintiff **disputes** Doe bragged to his co-workers about his ability to pick up women at clubs. Plaintiff **admits** Doe bragged about being able to talk to women at clubs. [126] Plaintiff **objects** to Wamble's testimony as inadmissible hearsay and cumulative.

52.   Plaintiff disputes and objects to this allegation because it is vague and speculative and does identify the source for concluding Doe has a reputation of any nature.

---

[126] Ex. 5 [Doe Dep.  241:2-9].

**D.      Doe's Delay in Reporting the Alleged Harassment and McPherson's Corrective Measures to Remedy Any Alleged Harassment.**

53.      Plaintiff **admits** Doe believed McPherson's Sexual and Unlawful Harassment applied to Painter and McPherson's conduct.

54.      Plaintiff **admits** Doe testified that about a year into his employment Doe told Tipton "it [the name calling] wasn't appreciated, [he] didn't like it, [he] didn't respond well to it and it needed to end." (Doe Depo. at pp. 259:7-260:15) and Doe told Tipton he wanted Painter and Mike to address him by his first name or "sir." (*Id*.).

55.      Plaintiff **admits** Doe testified that Doe told Beasley and Smith they would "horseplay around to make the day go by, talk, laugh, have fun, but [he] was sick and tired of it and [he] couldn't put up with it anymore and it was driving [him] crazy, and [he] wanted it to end." (Doe Depo. at pp. 222:20-224:5).

56.      Plaintiff **admits** Doe failed to report any of the comments made by Beasley and Smith to McPherson's Human Resources personnel in 2006 because he liked Beasley and Smith and did not want them to lose their jobs.

57.      Plaintiff **disputes** Doe testified that he failed to report any of the comments made by Painter or Mike in 2006 because he thought he would lose his job, because in 2005, Doe began complaining to his supervisors of the harassment from Mike and Painter. Doe complained directly to Tipton, Mike, and Painter, and

Chapman. Doe's complaints are discussed herein in **PLAINTIFF'S  STATEMENT OF DISPUTED FACTS.**

58.    Plaintiff **admits** no one at McPherson ever told Doe that he should not report harassment complaints to Defendant's human resources personnel and he was not aware of anyone whose employment was terminated after complaining of harassment. [127]

59.    Plaintiff **admits** Doe testified that Beasley and Smith immediately apologized and "it didn't happen again" after he talked to them in 2006.

60.    Plaintiff **disputes** the allegation that Doe only recalls one other conversation with Tipton about the comments and Doe told Tipton the same thing as in their first conversation. Defendant, citing (Doe Depo. at pp. 261:8-262:9), critically distorts Doe's testimony because in Defendant's precise citation, Doe testified that complained to Tipton on six to eight occasions. [128]

61.    Plaintiff **disputes** the allegation in this paragraph for the reason that he met with Tipton on six to eight occasions. [129]

62.    Plaintiff admits that during the week of November 3, 2007, Doe spoke to McPherson's Human Resource Director, Anna Marie Chapman ("Chapman") about Painter and Michael McPherson's "constant bantering" and that he did not feel like he fit in with Painter and Michael McPherson. Doe told Chapman about

---

[127] Ex16 [Declaration of Doe, p. 2, para. 5]
[128] Ex. 5 [ Doe Dep. 261:8-11]
[129] Id.

three comments made by Painter and McPherson. Plaintiff **disputes** any allegation concerning any personal issues because such matters are not relevant and disputes that this was the first time he spoke to Chapman about Mike and Painter's sexually offensive comments to him, because he met with Chapman in late October, i.e. October 30/31, 2007.

64.     Plaintiff **admits** the only reason Doe did not bring his complaints to Chapman before November 3, 2007 was because he "loved his job" Plaintiff **asserts** that he met with Chapman on or about October 30/31, 2007, and he discussed his complaints concerning the comments by Mike and Painter.

65.      Plaintiff **admits** Chapman told Doe that she would investigate his complaints.

66.     Plaintiff **admits** Doe had such a conversation with Mike, stating he "was tired of the comments" and "it was getting old.", but Plaintiff **denies** it occurred around the time Doe complained to Chapman.

67.     Plaintiff disputes such allegation as inadmissible hearsay

68.     Plaintiff disputes such allegation as inadmissible hearsay.

69.     Plaintiff **disputes, objects, and moves to strike** this allegation because it is vague and inadmissible as four levels of hearsay, to- wit: Defendant alleges: (1) Doe made alleged statements to Mike, Painter, and Beasley, and other unidentified employees; (2) Painter, Mike, and Beasley allegedly heard such

statements; (3) Painter, Mike and Beasley allegedly informed Chapman; and (4) Mike Bedford is Defendant's single cited source for this allegation. There is no evidence Bedford ever heard Doe make any of the alleged comments first-hand, and therefore, there is no dispute that Bedford did not hear any of Doe's alleged comments from Doe. Plaintiff **disputes, objects, and moves to strike** the allegation that Doe made the alleged statements about Mike and Painter because it is vague and inadmissible hearsay, to-wit: (1) Defendant alleges Doe made such statements, (2) to unidentified persons; *or assuming arguendo*, to Painter, Mike, and Beasley, and (3) the persons who heard such statements reported them to Chapman. Defendant cites Chapman as the sole source of this allegation. There is no evidence Chapman ever heard Doe make any of the alleged comments first-hand, and therefore, there is no dispute that Chapman did not hear any of Doe's alleged comments from Doe. Moreover, despite Mike, Painter, and Beasley providing depositions in this case, Defendant does not cite these witnesses as the source for any of the allegations in paragraph 69.

70.    Plaintiff **disputes** the allegation Chapman counseled Painter and Mike about the language in the warehouse and instructed them to stop making any inappropriate comments or remarks because Defendant **admits** the actions by Painter and Mike were significantly more egregious. Chapman testified:

Q.   . . . . Anyone found to be engaging in any type of **unlawful discrimination** will be subject to disciplinary action up to and including termination of employment? Do you see that?

A.   Yes.

Q.   Was that the type of discipline that McPherson Companies imposed on Randy Painter and Mike McPherson?

A.   Yes.[130]

Moreover, Defendant disciplined Tipton for the same type of conduct as Mike and Painter, **unlawful discrimination**.[131] Defendant's discipline of Tipton, Mike, and Painter consisted of a **verbal counseling**.[132]

71.   **Plaintiff disputes** this allegation because it constitutes inadmissible hearsay, compounded by unknown hearsay communicators; to-wit: (1) Defendant alleges "the employees" Doe complained about, accused Doe of alleged comments in their statements to Chapman; (2) the employees are not specifically identified; (3) Doe's alleged statements are not identified; (3) as set forth above, there is no dispute Chapman did not have first-hand knowledge of Doe's statement. Moreover, in the event Defendant is relying on Mike, Painter, and Beasley, as the employees who reported Doe's alleged statements to Chapman, Defendant does not cite these witnesses as the source for any of the allegations in paragraph 70. Furthermore, Plaintiff **disputes** Chapman counseled Doe concerning any of his

---

[130] Ex. 3  [30(b)(6) Dep.  (Chapman) 113:4-13]
[131] Ex. 3  [30(b)(6) Dep.  (Chapman) 19:23; 60:1-10; 60:19-23; 61:1-3]
[132] Ex. 3 [30(b)(6) Dep. (Chapman) 130:12-23; 131:1-3]

comments because Defendant admits it never disciplined Doe for any bantering and Defendant never disciplined Doe for violating the sexual harassment policy.

72.     Plaintiff disputes that he ever made any sexually offensive comments to his coworkers and objects on the basis that such allegations are inadmissible hearsay.

73.     Plaintiff **admits** Doe testified that in his second meeting with Chapman he responded yes to her question of whether the comments had stopped; however, Plaintiff **disputes** this allegation because Doe testified Painter continued making sexually related comments after Doe had talked to Chapman.[133] Doe testified that after he talked to Chapman, he is "pretty sure" Painter made the following comments to him: (a) "What, is the battery on your butt plug going dead?'; and (b)"I swear, that boy can't do nothing without something shoved up his ass**.**"[134]

## E.     Doe's Employment in 2007-08, His Personal Problems, and Events Leading Up to the 2008 Reduction-in Force.

73.     Plaintiff **admits** on February 7, 2007, Doe received his annual performance evaluation for 2006 year and his rating was "meets expectations", which on a scale of 1 to 4 with "1" being the worst and "4" being the best, he received an overall rating of "2."

---

[133] Ex. 3  [30(b)(6) Dep. (Chapman) 130:12-23; 131:1-3]
[134] Ex. 5 [Doe Dep. 262:15-23; 263:1-19.]

74.    Plaintiff **disputes**, **objects, and moves to strike** this allegation because such evidence is not relevant, Defendant does not have any policy prohibiting employees from requesting a payroll advance, Defendant never disciplined Doe for any such action related to a payroll advance, and all evidence relating to Doe's child support payments, house payments, and mortgage are not relevant and unfairly prejudicial.

75.    Plaintiff **disputes**, **objects, and moves to strike** this allegation because such any evidence of marital problems is not relevant and unfairly prejudicial.

76.    Plaintiff **disputes**, **objects, and moves to strike** this allegation because any evidence of marital problems, discussing marital problems at work, and crying at work is not relevant and is unfairly prejudicial; and Doe was never disciplined for any such conduct.

77.    Plaintiff **disputes**, **objects, and moves to strike** this allegation because any evidence of marital problems, discussing marital problems at work, and crying at work is not relevant and is unfairly prejudicial; and Doe was never disciplined for any such conduct.

78.    Plaintiff **disputes**, **objects, and moves to strike** this allegation because any evidence of marital problems, discussing marital problems at work,

and crying at work is not relevant and is unfairly prejudicial; and Doe was never disciplined for any such conduct.

79.   Plaintiff **disputes and objects to this allegation conduct because it is inadmissible hearsay and Chapman has no foundation to testify about Painter's state of mind, i.e. his alleged concerns about Doe.**

80.   Plaintiff **objects** to this allegation because any discussion of his marital and financial issues is inadmissible as irrelevant.

81.    Plaintiff **disputes** this allegation that Painter tried to be lenient regarding Doe's attendance problems because he knew Doe was going through a difficult time with his divorce,  because the overall facts in this matter, considered cumulatively, do not support a finding that Painter tried to be lenient to Doe.

82.   Plaintiff **disputes** this allegation because he does not agree the test was random on the basis that the only persons who spoke to him were persons employed by Defendant. Plaintiff **disputes** all allegations concerning Defendant testing other employees as not relevant.

83.   Plaintiff incorporates its **disputes**  as set forth in paragraph 82.

84.   Plaintiff incorporates its **disputes**  as set forth in paragraph 82.

85.   Plaintiff incorporates its **disputes**  as set forth in paragraph 82.

86.   Plaintiff incorporates its **disputes**  as set forth in paragraph 82.

87.   Plaintiff incorporates its **disputes**  as set forth in paragraph 82.

88.     Plaintiff **disputes** this allegation as inadmissible hearsay concerning whatever other unidentified workers may have said about Doe.

89.     Plaintiff **admits** that on January 22, 2008, Doe met with Chapman and Painter about his attendance.

90.     Plaintiff **admits** Doe received a disciplinary warning for absenteeism.

91.      Plaintiff **admits** that Chapman spoke to Doe.

92.     Plaintiff **disputes** this allegation because there is no evidence Doe knew he had any opportunity to comment on the disciplinary form because he had

93.      Plaintiff **admits** that on February 6, 2008, Doe was forty-five (45) minutes late to work.

94.     Plaintiff **admits** that on February 7, 2008, Doe did not come to work, and notified Defendant of his absence.

95.     Plaintiff **objects and moves to strike** this allegation as inadmissible hearsay concerning Tipton's communications with Sam Moyer ("Moyer") McPherson's IT Analyst.

96.     Plaintiff **objects and moves to strike** this allegation because Moyer's statements, including written statements, are inadmissible hearsay.

97.     Plaintiff **admits** Doe used his work computer for personal business.

98.     Plaintiff **objects and moves to strike** this allegation because Wamble's testimony is inadmissible hearsay.

**F.     The Reduction-in-Force**

99.     Plaintiff **disputes** this allegation because, as developed in **Plaintiff's Statement of Disputed Facts**, Bedford and the Executive Management Committee, via Chapman, disagree to the process utilized to discharge Doe, and the factors considered and not considered.

100.   Plaintiff **disputes** this allegation because of the reasons set forth in paragraph 99.

101.   Plaintiff **disputes** this allegation because of the reasons set forth in paragraph 99.

102. Plaintiff **disputes** this allegation because of the reasons set forth in paragraph 99.

103.   Plaintiff **disputes** this allegation because of the reasons set forth in paragraph 99.

104.   Plaintiff **disputes** this allegation because of the reasons set forth in

105.   Plaintiff **disputes** Bedford selected Doe for the reduction in force because he believed Doe's skill set, job performance and productivity were not as strong overall as the other employees in Renew because Bedford **admits he did not have knowledge of Doe's personnel file, evaluations, or disciplinary**

**record, and his version of events contradicts Painter's and Chapman's. Such facts are further developed in Plaintiff's Statement of Disputed Facts.**

106.   Plaintiff **disputes** this allegation for the reasons set forth in paragraph 105.

107.   Plaintiff **disputes** this allegation for the reasons set forth in paragraph 105.

108.   Plaintiff **disputes** this allegation for the reasons set forth in paragraph 105 and because such information is not relevant as to why Doe was selected for discharge/layoff.

109.   Plaintiff **disputes** this allegation for the reasons set forth in paragraph 105 and because such information is not relevant as to why Doe was selected for discharge/layoff.

110.   Plaintiff **disputes** this allegation for the reasons set forth in paragraph 105 and because such information is not relevant as to why Doe was selected for discharge/layoff.

111.   Plaintiff **disputes** this allegation for the reasons set forth in paragraph 105 and because such information is not relevant as to why Doe was selected for discharge/layoff.

112.   Plaintiff **disputes** this allegation for the reasons set forth in paragraph 105 and because such information is not relevant as to why Doe was selected for discharge/layoff.

113.    Plaintiff **disputes** this allegation for the reasons set forth in paragraph 105 and because such information is not relevant as to why Doe was selected for discharge/layoff.

114.   Plaintiff **disputes** this allegation for the reasons set forth in paragraph 105 and because such information is not relevant as to why Doe was selected for discharge/layoff.

## II.   <u>PLAINTIFF'S STATEMENT OF GENUINE DISPUTED MATERIAL FACTS</u>

The following facts are set forth as undisputed for Plaintiff's response to Defendant's summary judgment motion and brief. The following facts include many of Defendant's own admissions. The sole purpose for addressing these facts as disputed is all  facts, including those derived from Defendant,  must be construed in favor of the Commission, the non-movant in response to Defendant's Motion. Based on the (1) disputed facts set forth in Plaintiff's Response to Defendant's Alleged Undisputed Facts; (2) the facts set forth in this section; (3) the merits of the two Title VII claims in issue; (4) Defendant's failure to meet its burden of: (a) establishing undisputed facts as to every element of every claim

asserted by Plaintiff; and (b) proving every prong of every element of *Faragher/Ellerth* defense; and (5) the pretextual reasons for Defendant's conduct as established by its own actions, the Defendant's Motion is due to denied in its entirety.

## 1.   Defendant and Key Officials

1.     Defendant is one of the largest independent oil lubricant distributors in the nation.[135] The company's headquarters are in Trussville, Alabama. As of January 5, 2012, Defendant had approximately 270 employees.[136]

2.     Charles McPherson is the founder of the Defendant. Charles (Ken) McPherson, Jr. is the President. [137] Mike McPherson ("Mike") is Ken McPherson's cousin.[138]

3.     Defendant hired Anna Marie Chapman, a female, as Human Resources Director on June 1, 2007. She is the leading human resources official for Defendant.[139] Chapman reported to Brad Gray, Executive Vice President.[140]

4.     Mike Bedford served as Vice President of Operations for Defendant from 2006-2010.[141]

---

[135]  Ex. 1  [Web Page of Defendant]
[136]  Ex. 2  [Dep. (Ken McPherson) 14:21-22;15:2-5]
[137]  Ex. 2  [Dep. (Ken McPherson) 5:5-8:5]
[138]  Ex. 2  [Dep. (Ken McPherson)    11:4-8]
[139]  Ex. 3  [30(b)(6) Dep. (Chapman) 7:3-15]
[140]  Ex. 3  [30(b)(6) Dep. (Chapman) 7:16-19]
[141]  Ex. 4  [Dep. (Bedford)  9:12-10]

5.      Doe worked for Defendant from August 16, 2004-February 8, 2008, when Defendant discharged him involuntarily.[142] Doe worked in the Renew Department.[143]  The Department processes dirty oil into clean and reusable oil to be sold.[144]   On or about February 8, 2008, Chapman gave Doe a Separation Agreement and General Release.  Doe refused to sign the release of his claims.[145]

6.      As of September 19, 2005, Doe reported directly to Lamar Tipton.[146] Tipton reported to Mike, Assistant Operations Manager. Mike reported to Painter, Facility Operations Manager.[147] Painter reported to Bedford, Vice President of Operations.[148]

7.      Tipton, Mike, and Painter worked in the warehouse with Doe. Tipton, Mike, and Painter held higher positions of authority than Doe and had the ability to direct Doe to perform certain duties.[149]

8.      Tipton had daily contact with Doe.[150] Tipton had the authority to issue Employee Counseling Reports to Doe, including disciplinary reports. [151] Tipton

---

[142] Ex  3 [30(b)(6) Dep. (Chapman) 25:11-20]
[143]   Ex. 5  [Dep. (Doe) 103:12-23]
[144]   Ex. 6  [Dep. (Tipton) 11:8-11]
[145]   Ex. 3  [30(b)(6) Dep. (Chapman) 106:14-109:2]
[146]   Ex. 6  [Dep. (Tipton)  20:4-9]
[147]   Ex. 7  [Dep. (Mike)  13:19-14:16; 15:22-16:1-9]
[148]   Ex. 3  [30(b)(6) Dep. (Chapman) 30:2-6]
[149]   Ex. 3  [30(b)(6) Dep. (Chapman) 31:20-23; 32:1-3]
[150]   Ex. 6  [Dep. (Tipton)  44:17-20]
[151]   Ex. 6  [Dep. (Tipton)  58:6-12]

has known Doe for approximately (25) twenty-five years and his opinion of Doe's truthfulness and credibility is that he is "a pretty honest guy."[152]

9.   Mike and Painter had the authority to: (a) take disciplinary action against Doe; and (b) direct Tipton to take disciplinary action against Doe.[153] [154]

**2.   <u>Training</u>**

10.   Defendant never explained to Tipton: (a) the type of conduct that constitutes sexual harassment when a man's conduct is asserted to be offensive against another man; or (b) the meaning of equal employment opportunity (EEO) retaliation.[155]

11.   Tipton does "not remember" receiving any training as to how to train other employees concerning unlawful sex harassment involving a male's conduct against another male.[156]

12.   Tipton never received training on how to: (a) resolve an internal EEO complaint;[157] (b) preserve evidence;[158] (c) maintain an investigation file for an EEO complaint; [159] or (d) respond to an EEOC complaint.[160]

---

[152]   Ex. 6  [Dep. (Tipton)  7:1-4; 45:25; 46:1-4]
[153]   Ex. 7  [Dep. (Mike) 15:19-16:3]
[154]   Ex. 8  [Dep. (Painter) 18:10-20]
[155]   Ex. 6  [Dep. (Tipton) 19:5-14]
[156]   Ex. 6  [Dep. (Tipton) 17:2-7]
[157]   Ex. 6  [Dep. (Tipton) 18:6-7]
[158]   Ex. 6  [Dep. (Tipton) 18:16-19]
[159]   Ex. 6  [Dep. (Tipton) 18:20-19:1]
[160]   Ex. 6  [Dep. (Tipton) 19:2-4]

13.     Mike, as Assistant Operations Manager, "does not know" if had received any training as to: (a) the definition of unlawful sexual harassment when it involves a man engaging in offensive conduct toward another man; (b) the procedure for responding to sexual harassment complaints involving a man's offensive conduct toward another man; or (c) how to preserve evidence when an employee files an internal complaint of unlawful sexual harassment involving a male's conduct toward another male.[161]

14.     Concerning <u>internal complaints</u> of sexual harassment involving offensive conduct by a man toward another man, Mike did not receive any training as to: (a) respond to such complaints;[162] and (b) investigating effectively a sexual harassment or retaliation complaint.[163]

15.     Mike did not train any of the employees he supervised as to: (a) the definition of unlawful harassment involving a male against another male; (b) how to respond to an internal complaint of sexual harassment involving a male against a male; (c) how to respond to an internal complaint of equal employment opportunity retaliation. [164]

---

[161] Ex. 7  [Dep. (Mike)   17:22-18:5; 18:14-20; 18:21-19:4]
[162] Ex. 7 [Dep. (Mike)   18:6-13]
[163] Ex. 7 [Dep. (Mike)   21:10-13]
[164] Ex. 7 [Dep. (Mike)   19:17-22; 20:3-14]

16.    Mike never provided any training to Lamar Tipton concerning unlawful sexual harassment or equal employment opportunity retaliation.[165]

17.    Prior to Doe's discharge in February 2008: (a) Mike's training concerning sexual harassment and retaliation consisted of receiving Defendant's Employee Handbook in 2005; and (b) Mike did not attend training on sexual harassment or retaliation other than receiving the handbook.[166]

18.    Painter did not provide any training to employees under his supervision concerning: (a) sexual harassment or a hostile work environment based on sex involving offensive conduct by a male toward another male; or (b) EEO retaliation.[167]

19.    Painter did not have any understanding as to the meaning of Title VII.[168]

20.    Painter received the Defendant's Handbook dated January 1, 2005; however, he never received any training concerning the Handbook.[169]

21.    Concerning Defendant's Sexual Harassment Policy, Painter initially testified that because there is no acknowledgment signed by him that he received the policy, it is possible he did not receive the policy.[170] Subsequently, Painter

---

[165] Ex. 7 [Dep. (Mike)    24:6-11]
[166] Ex. 7 [Dep. (Mike)    23:7-19]
[167] Ex. 8   [Dep. (Painter)  33:5-17]
[168] Ex. 8   [Dep. (Painter)  31:4-6]
[169] Ex. 8   [Dep. (Painter)  34:8-23; 85:1-11]
[170] Ex. 8   [Dep. (Painter)  87:10-14; 89:1-9]

testified he received the policy but admitted he has no idea when he received it or when he read the policy.[171]

22.   **At the time of Doe's complaints to Chapman concerning Mike and Painter, Defendant did not have any knowledge that Mike and/or Painter ever received any training in same sex discrimination or same sex harassment.**[172]

23.   Prior to Doe's complaint to Chapman, Defendant does not have any knowledge that during the tenure of Chapman, since June 1, 2007, Tipton, Mike, or Painter had been given training as to: (a) the definition of unlawful same sex harassment; (b) developing a comprehensive anti-harassment same-sex policy; (c) conducting   an effective investigation of a same sex harassment charge; (d) resolving a complaint of same-sex harassment; (e) preserving evidence  and the investigation file;[173] (f) responding to an administrative complaint of same-sex harassment; or (g) training other employees concerning same-sex harassment charges.[174]

24.   **Defendant, via Chapman, did not give any same-sex discrimination or harassment training to Defendant employees prior to date of Doe's discharge.**[175]

---

[171]  Ex. 8   [Dep. (Painter)  89:22-23;90:1; 91:6-9]
[172]  Ex. 3   [30(b)(6) Dep. (Chapman) 112:7-17]
[173]  Ex. 3   [30(b)(6) Dep. (Chapman) 127-18-23; 128:1-23; 129:1-17]
[174]  Ex. 3   [30(b)(6) Dep. (Chapman) 130:1-11]
[175]  Ex. 3   [30(b)(6) Dep. (Chapman) 23:7-19]

25.     **Defendant did not provide Tipton, Mike, and Painter any training concerning equal employment opportunity retaliation prior to June, 2008, approximately (4) four months after Doe's discharge.** [176]

26.     Defendant's performance evaluation practice during Doe's employment involved Defendant providing evaluations around the first of the year for the prior year. Doe received an evaluation every year, except his last full year of employment, 2007. Painter did not know why Defendant did not provide  [Doe] a performance evaluation for the year 2007 and present such evaluation to Doe in January or February of 2008.[177]

**3.     Harassment**

27.     Doe testified concerning the Defendant's 25 Comments/Actions.[178]

28.     Mike and Painter made all 25 comments and engaged in all of the aforementioned 25 comments/actions directed.[179] Doe testified of the impact of Mike and Painter's conduct on him:

>    A.     I mean, three 4 years of this –
>
>    Q.     When you say, "this," you're pointing to that Exhibit 1? [Ex. 10 to this Response]
>
>    A.     Page 3, B, 1 through 25, just every day, every other day, over and over and over and over and over till it beats you down mentally. And, you know, you would like to think you're stronger than that, but

---

[176] Ex. 3 [30(b)(6) Dep. (Chapman) 133:18-23;134:1-15]
[177] Ex. 8 [Dep. (Painter) 79:20-80:1-2; . 80:11-13; 80:10-13; 82:3-11]
[178] Ex. 5  [Doe Dep. 358:4-18]
[179] Ex. 5  [Doe Dep. 358:4-18; Ex. 10]

over that length of a period of time, if you're coming to work, doing other people's jobs, cleaning other people's areas, doing everything you can to gain respect, to climb the ladder and getting nowhere with it, then this beats you down as a man.

Q. . . . you felt like they did it because it bothered you. Do you think that's true?

A. At first I didn't let them know it bothered me, but as it got on a grander scale, yeah. I mean, they could tell it bothered me. It bothered me a lot. If I walk in a room that's got seven people in it, you know, you say everybody pull their pants up, he's going to suck your dick, it affects you. If I've got salesmen I'm dealing with and they're not even from McPherson Oil and I'm trying to earn their respect and have a man-to-man conversation and your supervisor walks by and, you know, what's up, faggot, it just hammers you down day after day after day after day.[180]

33.    Doe described the incident involving the deer testicles.

Q. Tell me about that incident [re: deer testicles].

A. I come in to work and the body parts were all over my desk. Nothing to protect my desk, my paperwork, blood everywhere. I didn't really know what it was at first until I got up on it, and then it pretty much freaked me out.[181]
. . . .

Q. Do you know why that was put on your desk?

A. It was deer testicles, you know.[182]
• • • •

Q. Was it to threaten you? Were you threatened by it?

---

[180] Ex. 5 [Doe Dep. 333:3-25; 334:1-12; Ex. 10, p. 3, para. B, 1-25]
[181] Ex. 5 [Doe Dep. 329:4-14; Ex. 10, p. 3, para. B, # ???1-25]
[182] Ex. 5 [Doe Dep. 330:9-11; Ex. 10, p. 3, para. B, # ???1-25]

95

A. I felt it was more of the gay stuff.

Q. What about that is – references  gay?

A. The anatomy parts of an animal.[183]

. . . .

Q. All right. So, was there some sort of joke about deer legs and testicles and being gay?

A. I just remember, "[Doe's] got some big old balls on his desk." Personal opinion, Michael done it. He laughed the most and got the biggest kick out of it.[184]

33.     When Doe walked in a room, Mike and Painter, would state:

A.     …if I walked in a room that they were in, they would jump away real quick like don't grab my ass, he's going to pinch you or he's going to bow you over.[185]

34.     Defendant admits Mike "probably" called Doe a: (a) queer; [186] and (b) bitch.[187] Mike does not remember the number of times he called Doe a queer and/or bitch.[188]

35.     Defendant admits Mike "possibly" called Doe a:  (a) fag; [189] (b) mother fucking queer; [190] (c) faggot; [191]  (d) dick; [192] and (e) homo or something similar to such comment.[193]

---

[183] Ex. 5   [Doe Dep. 329: 33:3-25; 334:1-12; Ex. 10, p. 3, para. B, 1-25]
[184] Ex. 5   [Doe Dep. 331:14-23; 332:1-4; Ex. 10, p. 3, para. B, 1-25]
[185] Ex. 5   [Doe Dep. 332:15-19]
[186] Ex. 7   [Dep. (Mike) 73:5-10]
[187] Ex. 7   [Dep. (Mike) 80:10-15]
[188] Ex. 7   [Dep. (Mike) 73:5-10]
[189] Ex. 7   [Dep. (Mike) 73:14-19]
[190] Ex. 7   [Dep. (Mike) 75:1-2]

36.     Defendant admits Mike does not recall the number of times he called Doe a fag, mother fucking queer, faggot, dick, or homo or something similar to such comment.[194]

37.     Defendant admits Mike stated to Doe, when another person was adjusting his pants, "[blank] undoes his pants and poof, you appeared like a fairy.[195]

38.     Defendant admits it found Mike had called Doe a fag, faggot, queer, ass-breath, and mother-fucking queer, and made the comment, unrelated to Doe, "I will take you behind a tank and have sex with you." [196]

39.     Mike observed deer testicles on Doe's desk where the deer had two chopped off legs. Mike did not take any action after such observing the deer parts.[197]

40.     Defendant admits Painter called Doe a fag, faggot, possibly, a queer. [198]

*(a)*   ***Doe's Co-Workers Observations of Harassment, Doe's Complaints, and Retaliation against Doe***
        *(1)*   ***Merrell Smith***

41.     Merrell Smith worked with Doe in the Defendant's warehouse. Smith provided the following Declaration,[199] dated April 6, 2011. Smith's statement

---

[191] Ex. 7   [Dep. (Mike) 71:7-11]
[192] Ex. 7   [Dep. (Mike) 74:2-5]
[193] Ex. 7   [Dep. (Mike) 74:10-15]
[194] Ex  7   [Dep. (Mike) 73:14-19; 75:1-2; 71:7-11;74:2-5; 74:10-15]
[195]  Ex. 7  [Dep. (Mike) 78:8-23; 79:1-6]
[196]  Ex. 3   [30(b)(6) Dep. (Chapman) 68:3-14]
[197]  Ex. 7  [Dep. (Mike) 76:12-77:1]
[198]  Ex. 3  [30(b)(6) Dep. (Chapman) 67:11-68:2]; Ex. 10 (Dep. Ex. 1, Plaintiff's 30(b)(6) Notice)].

supports Plaintiff's positions on the following issues: (a) harassment suffered by Doe; (2) Doe's role as Renew Supervisor, (3) Doe's harassment complaints to Tipton, Mike, Painter, and Chapman, and thereafter: (4) Painter's continued sexually offensive statements to Doe; (5) Defendant's subsequent removal of Doe from the Supervisor position; (6) Defendant's assignment of Smith and Doe to a dangerous oil tank procedure. Moreover, Smith's declaration provides evidence that Defendant attempted to suppress evidence, by Chapman and Bedford, shortly after Doe's discharge, directing Smith not to see or talk with Doe. Smith declared:

> I,     Merrell Smith, make the following statements voluntarily and based on my own good *faith and belief:*

> (1-2)  I worked at McPherson Companies from 2004 until September 2010, in Trussville, Alabama. At McPherson Companies, I worked in the same Department as [Doe].

> (3)     I worked with [Doe] throughout his employment at McPherson Companies, from approximately August 2004 until on or about February 15, 2008, the date of [Doe's] discharge.

> (4)     I worked closely with [Doe] because he served as my supervisor in his position as Supervisor of the Renew Department. I was a driver in the Department.

> (5-6)  [Mike] served as [Doe's] second level supervisor. [Painter] served as [Doe's] third level supervisor. [Painter] was the main boss for the warehouse facility in which [Doe] and I worked.

> (7)     [Mike] and [Painter] called [Doe] offensive and degrading names in a harassing manner.

---

[199] Ex. 12, [Declaration of Merrell Smith, para. 1-21].

(8)    I viewed the statements by [Mike] and [Painter], to [Doe], as attacks on [Doe's] masculinity; for example, statements to cut down [Doe's] masculinity.

(9)    [Mike] and [Painter] treated [Doe] as feminine.

(10)   [ Painter] and [Mike] both made the following statements to [Doe], at the worksite:

      A.      You are feminine.
      B.      If you would just act more like us; watch football, go hunting; you would      not have these problems (i.e. being called such offensive names and treated in the manner in which he was treated).
      C.      Fag.
      D.      Faggot.
      E.      Fairy.
      F.      Fag-Fairy.
      G.      Queer.
      H.      Ass-breath.
      I.      Dick-sucker.
      J.      Homo.

(11)   [Painter] made the following statements to [Doe], at the worksite:

      A.      You act and walk like a woman or girl.
      B.      Whistling at Mr. Doe, in the offensive manner that a man may whistle at a female.
      C.      Dick-Sucking-Queer.
      D.      You have had plenty of nuts in your mouth before.
      E.      What do you do, put your cell phone up your butt and make it vibrate like a butt plug.

(12)   [Mike] made the following statement to [Doe], at the worksite:

      A.      When somebody's pants fall down, [Doe] walks in.

(13)   I am aware that during the time [Doe] was employed at McPherson Companies, someone placed a deer's testicles and two chopped-off deer

legs; on [Doe's] work desk, which was covered in the blood from the animal parts.

(14)  I viewed the statements by [Mike] and [Painter], to [Doe], as offensive.

(15)  I observed [Doe] become increasingly emotionally upset because of the statements directed at him by [Mike] and [Painter].

(16)  I am aware that [Doe] complained to [Mike] and [Painter] about the statements and asked them to stop making the offensive statements to him. Also, I am aware that [Doe] complained to Anne Chapman, McPherson Companies' Human Resources Director, about the statements made by [Mike] and [Painter], and asked her to have [Mike] and [Painter], to stop making the statements to [Doe].

(17)  [Painter] following [Doe's] objections to the statements and complaints concerning the statements, continued to make such offensive statements **to [Doe]**, up to the time [Doe] was discharged by McPherson Companies.[Emphasis supplied].

(18)  Mr. Painter, following [Doe's] discharge from employment at McPherson, continued to make such statements about [Doe].

(19)  I am aware that after [Doe] complained about the statements and asked Mr. McPherson and Mr. Painter to stop the statements and after he complained to Anne Chapman, McPherson Companies made it really difficult for [Doe]. Examples of such treatment of [Doe's] by McPherson Companies' include:

    A.    [Painter's] continued offensive statements to [Doe].

    B.    Removing [Doe] from his position as Supervisor of the Renew Department and replacing him with another employee.

    C.    During a time that [Doe] was emotionally upset and McPherson Companies knew [Doe] was enduring stress, McPherson Companies assigned [Doe] to a dangerous assignment; the task was to travel with me to a steel mill and climb into an oil tank, which was dark, filled with gases, and presented oxygen deprivation. The job was

sufficiently dangerous that I had previously received OSHA training for the task.

(20)   On the day McPherson Companies discharged [Doe], McPherson Companies required me and Eric Beasley, another employee, to meet with Ms. Chapman. She asked for our statements about the events relating to [Doe].  At some point thereafter, Mike Bedford, a high-ranking official with McPherson Companies, and Ms. Chapman, told us not to see or talk to [Doe], and stood in the way of me leaving the building to talk to [Doe] as he left the McPherson Companies' property.

(21)   I have read every paragraph of this Declaration and the statements which I have made are true and correct to the best of my knowledge.[200]

42.   On January 3, 2012, Smith provided deposition testimony. Smith's deposition testimony supports his Declaration.[201]

### (2)   *Nathaniel Shane Blackmon*

43.   Nathaniel Shane Blackmon worked with Doe in the Defendant's warehouse. Blackmon provided the following Declaration,[202] dated December 7, 2010.  Blackmon's statement supports Plaintiff's positions on the following issues: (1) harassment suffered by Doe; (2) Doe's role as Renew Supervisor; (3) Doe's harassment complaints to Tipton, Mike, Painter, and Chapman, and thereafter: (4) Painter's continued sexually offensive statements to Doe; (5) Defendant's removal of Doe from the Supervisor position. Blackmon declared:

---

[200] Ex. 12  [Declaration of Merrell Smith, para. 1-21]
[201] Ex. 13  [Dep. (Smith) p. 7:1-11; 10:7-23; 12:18-23; 13:1-12; 18:1-23; 19:1-23; 20:1-23; 21:1-23;  22:1023; 22:1-23; 23:1-23; 24:1; 26:14-23; 27:1-18; 29:1-14; 30:16-23; 31:1-23; 32:1-23].
[202] Ex. 12  [Declaration of Merrell Smith, para. 1-21].

I,   Nathaniel Shane Blackmon, make the following statements voluntarily and based on my own good faith and belief:

(1-2)  I have worked at McPherson Companies from June 2007, through the present date. I work at the McPherson Companies' facility in Trussville, Alabama. I am employed as a warehouse worker.

(3)    I worked with [Doe] at McPherson Companies, in the same building, from approximately June 2007, until on or about February 15, 2008, the date of. [Doe]'s discharge.

(4-5)  [Mike] was my direct supervisor, through and after the date of [Doe]'s discharge, but he is no longer my boss. [Painter] is the main boss for the warehouse facility in which [Doe] worked, and in which I work.

(6)    [Mike] and [Painter] held higher-ranking positions of employment with McPherson Companies than [Doe] during the time [Doe] was employed with McPherson Companies.

(7)    [Doe] was employed in the Renew Department at McPherson Companies.

(8)    [Doe] simply stood out from the other male employees. [Doe] (1) wore hoop earrings in both ears; (2) had blond highlight/streaks in his hair and wore it standing up; (3) occasionally wore flip-flop shoes into work, on his way to the dressing room where he changed into his work clothes and work boots; and (4) was exceptionally clean, in his appearance, compared to his co-workers.

(9)    **Mike McPherson and Randy Painter called [Doe] offensive and degrading names in a harassing manner; over a long period of time; <u>way beyond the point of a joke or locker room talk.</u>** [Emphasis supplied].

(10)   I viewed the statements by Mr. McPherson and Mr. Painter to [Doe] as offensive and degrading.

(11)   I viewed the statements by Mr. McPherson and Mr. Painter, as attacks on [Doe]'s masculinity; statements cutting down [Doe]'s masculinity.

(12)   Mr. McPherson and Mr. Painter treated Mr. [Doe] as feminine.

(13)   Randy Painter and Mike McPherson both made the following statements to [Doe], at the worksite, over a long period of time, on almost a daily basis:

      A.    Fag.
      B.    Faggot.

(14)   Mike McPherson made the following statements to [Doe], at the worksite:

      A.    Queer. [Mr. McPherson made this statement to. [Doe] numerous times.].

      B.    Everyone needs to pull their pants up because [Doe] is here.

(15)   I did not see any reason for Mr. Painter and Mr. McPherson to make the above statements to [Doe].

(16)   I have known Mr. [Doe] for approximately 30 years. Mr. [Doe] is not a homosexual.

(17)   [Doe] talked to me about the above statements Mr. McPherson and Mr. Painter made to him, and about him. [Doe] was very upset, emotional, and stressed about the above statements made by Mr. McPherson and Mr. Painter, and as time passed by, and the statements continued, [Doe] became more upset, more emotional, and more stressed by such statements.

(18)   I am aware that [Doe] complained to Mr. McPherson and Mr. Painter about the statements and asked them to stop making the offensive statements to him. Also, I am aware that [Doe] complained to Anne Chapman, McPherson Companies' Human Resources Director, about the statements made by Mr. McPherson and Mr. Painter, and asked her to have Mr. McPherson and Mr. Painter to stop making the statements to. [Doe].

(19)   On the day McPherson Companies discharged [Doe], McPherson Companies required me and other employees to meet with Ms. Chapman. Ms. Chapman told me and the other employees not to talk to anyone, including [Doe] and/or any lawyers, about the events concerning [Doe].

(21)   I have read every paragraph of this Declaration and the statements which I have made are true and correct to the best of my knowledge.[203]

44.   On December 12, 2011, virtually one year after providing his Declaration, Blackmon provided deposition testimony. Blackmon's deposition testimony contradicted a substantial amount of his prior Declaration. It is undisputed that Blackmon provided the Declaration on December 12, 2010, a date much closer to the events discussed in his Declaration, than the date of his deposition testimony.

### 4.    Doe's Complaints to Supervisors, Managers, and HR Director

45.   Doe, in 2005, he began complaining to his supervisors of the harassment from Mike and Painter. Doe complained to: (a) Tipton, on six to eight occasions, with the first occasion maybe a year after Doe began working with Defendant;[204] (August 2005); (b) Painter, in a heated conversation where Doe told Painter the comments had to end and Painter continued making comments after Doe complained directed at Doe; [205] and (c) Mike, where Doe and Mike "got into it really, really, really good" with Doe complaining about "all the gay comments and homosexual stuff had to come to an end" and subsequently, Doe complained again

---

[203] Ex. 14, [Declaration of Nathaniel Shane Blackmon]
[204] Ex. 5 [Doe Dep. 259:7-17; 261:10-11]
[205] Ex. 10 [Doe Dep. 259:7-17; 261:10-11]

104

to Mike, telling him "Enough is enough is enough."[206]. Mike, after every complaint to Mike, Mike continued to make comments directed at Doe.[207]

46.    Defendant and Mike admit: Doe complained to Mike regarding the comments made to him. [208] Mike understood Doe's complaint: (a) related to comments directly against Doe; and (b) included Mike's and Painter's comments to Doe.[209] Doe complained to Mike that the comments needed to stop, Doe was tired of them, and it was getting old.[210]

47.    Defendant and Mike admit: Mike, upon receiving Doe's complaints, did not report such complaints to Chapman.[211] Defendant's sexual harassment policy provides that any supervisor or manager who becomes aware of possible sexual or other unlawful harassment should promptly advise the Human Resources Manager or any member of management who will handle the matter in a timely and confidential manner.[212]

48.    Doe, prior to leaving Defendant's employment, told Tipton that he had contacted an attorney concerning Doe's employment rights.[213]

---

[206]  Ex. 5    [Doe Dep. 266:2-19]
[207]  Ex. 5    [Doe Dep. 266:2-19]
[208]  Ex. 7    [Dep. (Mike) 45:5-8]
[209]  Ex. 7    [Dep. (Mike) 46:13-22]
[210]  Ex. 7    [Dep. (Mike) 70:11-17]
[211]  Ex. 6    [Dep. (Mike) 77:2-8]
[212]  Ex. 1C  [C=confidential]
[213]  Ex. 6    [Dep. (Tipton) 79:4-10]

49.     Defendant admits:  Doe met with Chapman on October 30 or 31, 2007, and two or three occasions thereafter.[214] Defendant did not direct Doe to attend such meetings.[215]

50.     Defendant admits: Concerning her meetings with Doe, Chapman cannot recall if Doe informed her that he had retained an attorney regarding his employment issues.[216]

51.     Chapman, in one of her meetings with Doe, asked him if he had a tape recorder, and he took it out of his pocket and placed it on the table. [217]

52.     Defendant admits: Doe complained to Chapman about Mike and Painter calling him fag, faggot, and fag fairy.[218] Doe complained to Chapman that Mike said to him: (a) poof, pants come down, and there is the fag fairy;[219] and (b) "someone pulls his pants down to suck him off (sic)."[220]

53.     Defendant admits: Doe complained to Chapman that Painter said to him: (a) "you ought to know what a nut is"[221] and (b) in front of Tipton, "battery on butt plug run down; cannot get his job done without his ass (sic) vibrating."[222]

---

[214] Ex. 3 [30(b)(6) Dep. (Chapman) 52:6-13]
[215] Ex. 3 [30(b)(6) Dep. (Chapman) 53:4-6]
[216] Ex. 3 [30(b)(6) Dep. (Chapman) 57:11-15]
[217] Ex. 3 [30(b)(6) Dep. (Chapman) 57:22-23; 58:1]
[218] Ex. 3 [30(b)(6) Dep. (Chapman) 43:1-8; 45:4-9]
[219] Ex. 3 [30(b)(6) Dep. (Chapman) 64:23-65:2]
[220] Ex. 3 [30(b)(6) Dep. (Chapman) 154:22-155:13]
[221] Ex. 3 [30(b)(6) Dep.  (Chapman) 155:20-156:4]
[222] Ex. 3 [30(b)(6) Dep.  (Chapman) 156:18-20]

Furthermore, Doe complained management singled him out; explaining he did not fit in with the group in which he was working.[223]

54.     Near the end of October, 2007, Painter asked Chapman: "what point should we send [Doe] for his random drug test?"[224] Doe passed the drug test.[225] Doe, prior to being ordered by Defendant near the end of October, 2007, to take a random drug test, Doe had only been drug tested on one other occasion concerning his employment with Defendant; on or about August 11, 2004, in a pre-employment drug test.[226] Defendant offered and Doe accepted to take two days off from work without pay.[227]

55.     Defendant understands how the offensive comments by Mike and Painter would make Doe feel "uncomfortable", as well making him feel "uncomfortable" when repeated more than one time by his supervisors.[228]

56.     Chapman, after Doe's complaints and prior to his discharge, talked to Painter and Mike about Doe's complaints. Chapman does not recall if Painter or Mike informed Chapman that Doe had complained to them concerning the

---

[223]  Ex. 3 [30(b)(6) Dep.  (Chapman) 63:16-23]
[224]  Ex. 3 [30(b)(6) Dep.  (Chapman) 63:2-5]
[225]  Ex. 3 [30(b)(6) Dep.  (Chapman) 54:12-13]
[226]  Ex. 5 [Dep. (Doe) 105:13-22]
[227]  Ex. 3 [30(b)(6) Dep.   (Chapman) 59:19-23; 60:1-23; 61:1-3]
[228]  Ex. 3 [30(b)(6) Dep.  (Chapman) 164:21-23; 165:1-8]

comments they were making to Doe and asked them to stop making such comments.[229]

### 5.   Discipline of Supervisors and Managers

57.    Defendant disciplined Tipton, Mike, and Painter for their treatment of Doe. [230]. The reason for such discipline was: "they engaged in bantering with Doe" and the "comments made could be about same-sex."[231] The conduct was "inappropriate." [232]

58.    Defendant describes the discipline imposed on Mike and Painter, for their treatment of Doe, as:

> Q.   . . . . Anyone found to be engaging in any type of **unlawful discrimination** will be subject to disciplinary action up to and including termination of employment? Do you see that?
>
> A.    Yes.
>
> Q.    Was that the type of discipline that McPherson Companies imposed on Randy Painter and Mike McPherson?
>
> A.    Yes.[233]

59.    Chapman and Brad Gray, Executive Vice President, made Defendant's decision to discipline Mike and Painter.[234]

---

[229] Ex. 3 [30(b)(6) Dep.  (Chapman)  48:15-19]
[230] Ex. 3 [30(b)(6) Dep.  (Chapman) 65:19-20; 130:12-23; 131:1-3]
[231] Ex. 3 [30(b)(6) Dep.  (Chapman) 66:1-5 66:19-20]
[232] Ex. 3 [30(b)(6) Dep.  (Chapman) 67:1-4]
[233] Ex. 3 [30(b)(6) Dep.  (Chapman) 113:4-13]
[234] Ex. 3 [30(b)(6) Dep.  (Chapman) 19:23; 60:1-10; 60:19-23; 61:1-3]

108

60.    Defendant admits Tipton was disciplined in the same manner and for the same reason as the discipline imposed on Mike and Painter.[235] Thus, Defendant disciplined Tipton, as it did Mike and Painter: **unlawful discrimination**. Defendant imposed the same disciplinary action on Tipton, Mike, and Painter, **verbal counseling**.

61.    Defendant never disciplined Doe for any improper bantering. Defendant does not have a single document which sets forth any type of bantering engaged in by Doe.[236]

### 6.    Defendant's Disciplinary Practices

62.    Defendant's policy is to use progressive discipline in the disciplinary process.[237] The policy consists of a verbal warning, first written warning, second written warning with a suspension, and final warning.[238]

63.    Defendant uses the Employee Counseling Report for disciplinary actions. The Report sets forth the (a) Nature of Conduct, (b) Discussion; and (c) Disciplinary Action. There are six items under Nature of Conduct: (a) tardiness; (b) quality of work; (c) insubordination; (d) safety; (e) absenteeism; (f) quantity of work; (g) policy violation; and (h) other. Moreover, the Report provides for the following forms of Disciplinary Action: (a) verbal warning; (b) first written

---

[235] Ex. 3  [30(b)(6) Dep. (Chapman) 130:12-23; 131:1-3]
[236] Ex. 3  [30(b)(6) Dep. (Chapman) 65:16-18;167:19-23]
[237] Ex. 7  [Dep. (Mike) 32:12-22]
[238] Ex. 7  [Dep. (Mike) 30:22-31:13. 31:3]

warning; (c) second written warning; (d) suspension for the designated number of days; and (e) termination.[239]

64.     Defendant admits that Tipton, Mike, and Painter were disciplined for their treatment of Doe, admitted unlawful **discrimination,** and the discipline **was a verbal counseling.** Defendant did not use the Employee Counseling Report to discipline Tipton, Mike, and Painter, Thus, the discipline imposed on Tipton, Mike, and Painter  was less than the lowest form of discipline used by Defendant, a verbal warning on an Employee Counseling Report.

65.     On September 19, 2008, after Doe was discharged, Defendant issued a verbal warning on an Employee Counseling Report to [SUPERVISOR # 1], unrelated to Doe.[240] The disciplinary action was a designated "verbal warning" for conduct relating to "quantity of work." [241] Defendant did not discharge SUPERVISOR # 1.[242]

66.     Defendant disciplined [MANAGER and SUPERVISOR # 2], unrelated to Doe, by using progressive discipline, and Employee Counseling Reports.[243]

67.     Mike uses the progressive discipline process when he disciplines employees.[244]

---

[239] *See e.g.*, Ex. 2C; Ex. 3C; Ex. 4C
[240] Ex. 3C
[241] Ex. 3C
[242] Ex. 6  [Dep. (Supervisor # 1), 87:3-5]
[243] Ex. 7 [Dep. (Manager and Supervisor # 2) 31:14-20]

68.    On October 31, 2007, Defendant disciplined [MANAGER and SUPERVISOR # 2], by issuing an Employee Counseling Report. The designated nature of the conduct was "<u>quality</u>" and "<u>other</u>". The penalty was a one-day suspension.[245]

69.    On October 10, 2007, nine days following [MANAGER'S and SUPERVISOR # 2'S] receipt of disciplinary Report on October 1, 2007, Defendant again disciplined [MANAGER'S and SUPERVISOR # 2] through an Employee Counseling Report. On this second Report, the conduct at issue was again "<u>quality</u>" and "<u>other</u>". The penalty was a two-day suspension, and the Report designated as a final warning.[246]

70.    [MANAGER and SUPERVISOR # 2] was subject to a third disciplinary action in the form of verbal counseling for Defendant's admitted reason of his unlawful discrimination of Doe; as previously discussed herein. There is no evidence that such verbal counseling was ever issued to [MANAGER and SUPERVISOR # 2] in the form of a Report.

71.    Defendant, despite the three disciplinary actions against [MANAGER and SUPERVISOR # 2], and the fact that his Report of October 10, 2007 was

---

[244] Ex. 7  [Dep. (Mike) 31:21-32:1]
[245] Ex. 4C, p. 1-2
[246] Ex. 4C, p. 3-4

designated as a final warning, never discharged or subjected him to a reduction in force.[247]

72.    Defendant issued an Employee Counseling Report to [WAREHOUSE WORKER # 1], on September 18, 2006. Mike issued the Report.[248] The disciplinary action was a "<u>first written warning'</u> for "<u>tardiness</u>". Defendant did not discharge the warehouse worker from employment. Subsequently, on February 12-14, 2007, Defendant, through Mike, Painter, and Bedford, awarded a pay raise to the Warehouse Worker.[249] Subsequently, the Warehouse Worker resigned from Defendant for three-four weeks prior to February 20, 2008. [250] Thereafter, Defendant, on February 20, 2008, approximately (12) twelve days after Doe's discharge, offered WAREHOUSE WORKER # 1 the opportunity to re-join Defendant at the hourly rate of $19.00 per hour, with no break in service.[251] WAREHOUSE WORKER # 1 accepted the offer of reemployment at a higher pay rate than he was previously receiving from Defendant. [252]

73.    WAREHOUSE WORKER # 2 "resigned without proper notice" on August 16, 2004, the date Doe was hired. WAREHOUSE WORKER # 2 stated he was underpaid compared to Renew employees and overlooked for job of Lead

---

[247] Ex. 7 [Dep. (Mike) 34:22-23; 35:1-4]
[248] Ex. 5C
[249] Ex. 6C
[250] Ex. 3 [30(b)(6) Dep. (Chapman) 91:13-18]
[251] Ex. 7C
[252] Ex. 3 [30(b)(6) Dep. (Chapman) 91:13-23; 92:1-7]

Technician.[253] Defendant frequently referred to Doe's position as Lead Technician for Renew. As of February 24, 2008, after Doe's discharge, Defendant had rehired WAREHOUSE WORKER # 2 and given him a pay raise as Renew Technician.[254]

74.    Defendant admits the Renew Technician position WAREHOUSE WORKER # 2 performed was the same position that Doe had been performing.[255] Subsequently, on January 19, 2008, this WORKER applied for Production Supervisor in the Renew Department.[256] Thereafter, on January 28, 2008, approximately (11) eleven days before Doe's discharge, Defendant hired this WORKER for such position at an annual salary of $45,000.00.[257]

### 7.    Defendant's Discipline of Doe

75.    On January 22, 2008, Defendant issued an Employee Counseling Report to Doe, signed by Painter, Doe's third- level supervisor. The nature of the conduct was "Absenteeism". Defendant did not designate the following types of objectionable conduct on Doe's Report: (a) tardiness; (b) quality of work; (c) quantity of work; (d) insubordination; (e) policy violation; (f) safety or (g) other. The disciplinary action was "First Written Warning." [258]

---

[253] Ex. 8C
[254] Ex. 10C; Ex. 3 [30(b)(6) Dep. (Chapman) 91:13-23; 92:1-7]
[255] Ex. 9 [Dep. # 2 (Chapman) 41:7-23; 42:1-4]
[256] Ex. 9C
[257] Ex. 11C
[258] Ex. 2C

113

76.     This Report of Doe on January 22, 2008 is the only written disciplinary action received by Doe during his employment.[259]

77.     Defendant issued Doe the Report after Doe had met with Chapman and voiced his complaints concerning the comments and conduct of Mike and Painter.[260]

78.     Doe did not receive the progressive discipline step of a verbal written warning, as designated on the Report. On the Report form used by Defendant, there is a line providing for the penalty of a "Verbal Warning."[261] Tipton never issued Doe an Employee Counseling Report designating any verbal warning given to Doe.[262]

79.     Tipton, as Doe's direct supervisor from at least September 19, 2005, until Doe's discharge, never issued Doe a verbal warning or written warning on any of the Employee Counseling Reports for any of the following offenses listed on the Report, even though he had the authority to take such disciplinary action: (a) tardiness; (b) quality of work; (c) quantity of work; (d) insubordination; (e) policy violation; (f) safety; or (g) other.[263] Moreover, Tipton did not sign the January 22, 2008 Report.[264]

---

[259] Ex. 3 [30(b)(6) Dep. (Chapman) 153:12-18]; Ex. 6 [Dep. (Tipton), 30:17-22]
[260] Ex. 3 [30(b)(6) Dep. (Chapman)100:16-23;101:1-6]
[261] Ex. 2C
[262] Ex. 6 [Dep. (Tipton)    68:10-22]
[263] Ex. 6 [Dep. (Tipton)  76:9-77:16]
[264] Ex. 2C, p. 2

80.    Tipton had an agreement with Doe as to when Doe could come to work because of Doe's childcare responsibilities. **Tipton never issued Doe a written or verbal warning for tardiness.**[265]

81.    The penalties [MANAGER and SUPERVISOR # 2] received, a one-day suspension, a two day suspension and a final warning, are more severe disciplinary actions than Doe received on January 22, 2008, a first written warning. Also, Defendant, despite the final warning issued to [MANAGER and SUPERVISOR # 2],   imposed a verbal counseling to [MANAGER and SUPERVISOR # 2] for Defendant's admitted unlawful discrimination of Doe, a penalty less severe than [MANAGER'S and SUPERVISOR # 2'S] two aforementioned Reports, and the Report issued to Doe.

82.    Significantly, Mike, in his deposition, testified  that he cannot explain why he received two suspensions, each one greater in length, and a final warning, and kept his job, while Doe received a single Report, a first written warning, and lost his job.[266]

**8.    Defendant's Discharge of Doe**

83.    Tipton signed Doe's last performance appraisal on January 26, 2007. The rating was "meets expectations."[267] Tipton, as Doe's supervisor, gave Doe

---

[265]  Ex. 6  [Dep. (Tipton)  76:9-77:16]
[266]  Ex. 7  [Dep. (Manager and Supervisor # 2) 37: 3-23; 38:1-15]
[267]  Ex. 6  [Dep. (Tipton)   29:12-23-30:1]

performance evaluations and each evaluation had an overall rating. Tipton never

gave Doe an evaluation with an overall rating less than meets expectations.[268]

84.    Defendant discharged Doe on or about February 8, 2008. Defendant

via Chapman, testified:

> Q.    Mr. Doe was terminated due to his **poor work performance**
> and his **excessive absences**. Do you see that?
> A.  Yes.
> Q.  And would you agree with that?
> A.  Yes.
> Q.  And you would agree that his discharge was     involuntary?
> A.  Yes.[269]

85.    Also, Defendant asserts Doe was a part of a reduction in force.[270]

86.    Defendant did not discharge Doe for misconduct.[271]

87.    Mike Bedford was **the** decision maker to end Doe's employment.

Doe.[272] Bedford testified:

> Q.  Okay.  So is it your testimony that you made the decision for
> [Doe's] employment to end and not the team?
> • • • •
>
> Q.  Which one, did the team make the decision or did you make the
> decision?
>
> A.  **As I've already stated, I made the decision.**[273] [Emphasis
> supplied].

---

[268]  Ex. 6  [Dep. (Tipton)  59:17-60:3]
[269]  Ex. 3  [30(b)(6) Dep. (Chapman) 25:11-20]
[270]  Ex. 3  [30(b)(6) Dep. (Chapman) 123:10-20]
[271]  Ex. 3   [30(b)(6) Dep.  (Chapman) 123:5-9]
[272]  Ex. 4  [Dep. (Bedford) 9:12-10]
[273]  Ex. 4  [Dep. (Bedford) 74:10-18]

88.     Bedford was aware of Doe's complaints at the time of his decision to end Doe's employment. In the fall of 2007, Chapman informed him Doe had made complaints to her about employee statements to him which made Doe uncomfortable and Doe was making a complaint based on harassment terms.[274] Chapman informed Bedford that Doe had complained about being called a fag and faggot.[275]

89.     <u>In contrast to Bedford's position</u>, Defendant states the Defendant's executive management team, consisting of Chapman, Bedford, Ken McPherson, and Brad Gray, made the decision to end Doe's employment/subject him to a reduction in force. [276] Chapman, Bedford, and Gray knew of Doe's internal complaints of harassment at the time of the decision to end Doe's employment. As referenced above, Chapman had received the complaints from Doe and informed Bedford. Gray knew of the complaints because he and Chapman disciplined Mike and Painter for engaging in the conduct which Doe complained of to Chapman.

90.     Defendant's management team, prior to making the decision to end Doe's employment, did not review Doe's: (a) personnel file; (b) performance evaluations; [277] or (c) disciplinary file.[278]

---

[274] Ex. 4  [Dep. (Bedford) 22:12-22]
[275] Ex. 4  [Dep. (Bedford) 18:15-22]
[276] Ex. 9 [Dep. # 2 (Chapman) 16:7-11]
[277] Ex. 9 [Dep. # 2 (Chapman) 14:9-14:15]
[278] Ex. 9 [Dep. # 2 (Chapman) 17:2-13]

91.     Defendant's management team, prior to making the decision to end Doe's employment, did not rank any of the employees who would be subject to any reduction in force.[279]

92.     Defendant's management team discharged Doe because he was having performance issues, attendance issues, and inconsistency in his job performance and his performance did not meet expectations.[280]

93.     On or about March 29, 2006, during working hours, Doe received an email at my personal email address at work, sent from Mike, from his personal email address at work, with an attachment entitled: "**pompaperfetta**", which he viewed as pornographic. Previously, Sam Hovies, a McPherson employee, had used his McPherson business email address to send the attachment to Mike, who received it at Mike's McPherson business email address during work hours. Mike transferred the attachment to his private email address, and sent it to Doe at his personal email address. Mike received the attachment from Hovies, and sent the attachment to Doe, during working hours, using  Defendant's computers in the warehouse. [281]

---

[279] Ex. 9[Dep. # 2 (Chapman) 16:12-15]
[280] Ex. 9[Dep. # 2 (Chapman) 19:8-10]
[281]  Ex. 16 [Declaration of John Doe, p. 2, para. 10]

118

Dated this 25th day of July, 2012.

Respectfully submitted,

C. EMANUEL SMITH
(MS Bar #7473)
Regional Attorney
/s/ Julie Bean
JULIE BEAN
Supervisory Trial Attorney
(DC Bar #433292)


/s/ Steven L. Murray
STEVEN L. MURRAY
Senior Trial Attorney
D. C. Bar # 379955


/s/ Gerald L. Miller
GERALD L. MILLER
Senior Trial Attorney
(AL ASB-1454-E52G)


EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
Birmingham District Office
Ridge Park Place, Suite 2000
1130 22nd Street South
Birmingham, AL 35205
Telephone: (205) 212-2045


## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2012, I filed Plaintiff's Response to Defendant's Motion for Summary Judgment, with the Clerk of Court using the CM/ECF system which will electronically send notification of the filing to all attorneys of record.

/s/ Steven L. Murray
Steven L. Murray