FILED

2012 Nov-14  PM 03:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | } } } | |
| Plaintiff, | } } | CIVIL ACTION NO. 2:10-cv-02627-WMA |
| v. | } } | |
| THE MCPHERSON COMPANIES, INC., | } } } | |
| Defendant. | } | |

## MEMORANDUM OPINION

This Title VII case revolves around repeated churlish, childish, gross, sordid, vulgar, foul, disgusting, profane utterances in the workplace.  The question in the case, however, is not how vile and obnoxious this workplace language was.  It was vile and obnoxious enough to score nine on a scale of ten.  This will become apparent as the story unfolds.  The question for the court is rather whether this verbal mayhem morphed from a competition to see who could beat whom in the foul-mouth game into a cause of action under Title VII by an offended employee for same-sex sexual harassment.

This question comes before the court on cross-motions for summary judgment, one by plaintiff, Equal Employment Opportunity Commission ("EEOC"), and the other by defendant, The McPherson Companies, Inc. ("McPherson").  (Docs. 90, 102).  EEOC asks the court to find, as a matter of law, that McPherson is liable for retaliating against the charging party, and that certain of

McPherson's purported defenses to the retaliation claim are ineffectual. (Doc. 90). McPherson seeks summary judgment as to all of EEOC's claims. (Doc. 102). For the reasons set forth below, EEOC's motion will be denied, and McPherson's motion will be granted.

## Basic Facts Stated in the Light
## Most Favorable to EEOC[1]

EEOC filed this suit on behalf of John Doe[2] ("Doe") under its authority to enforce the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a)(1)(2). EEOC makes two claims: (1) a hostile work environment arising from the same-sex harassment of Doe, and (2) retaliation for Doe's opposition to the said discriminatory conduct.

McPherson is one of the largest independent oil lubricant distributors in the nation, with locations in Alabama, Florida, Georgia, Tennessee, and Mississippi. McPherson's headquarters is in Trussville, Alabama. Doe worked for McPherson in Trussville

---

[1] Rule 56, F.R.Civ.P., requires that a non-movant be given the benefit of the doubt on the evidence. When there are cross-movants, Rule 56 makes the task more difficult. Based on the unique procedural posture of this case, all facts and their reasonable inferences will be viewed in the light most favorable to EEOC, which is both a non-movant and a movant. Instead of submitting an affidavit from Doe in which he disputes upon personal knowledge, particular testimony of McPherson witnesses, EEOC offers a blanket denial of McPherson's entire evidence. This court has never encountered such a procedure. This is not the way to create a dispute of material fact.

[2] The charging party here is referred to both by EEOC and by the court as "John Doe" in order to preserve his anonymity.

from August 16, 2004 until February 8, 2008, when he was discharged during a reduction-in-force ("RIF").  During this entire time, Doe worked in the Renew Department, which recycles oil-based products. His job could fairly be described as "gritty and grimy".  Randy Painter ("Painter") was the Facility Operations Manager to whom Doe first reported.  After a reorganization in the fall of 2005, Doe reported to Lamar Tipton ("Tipton"), the Lead Blend Supervisor who oversaw the Renew Department.  Tipton, in turn, reported to Mike McPherson ("Mike").  Mike reported to Painter.  Tipton did not directly supervise Doe, although he had supervisory authority based upon his higher position.

When Doe began his employment, he was presented with the McPherson Employee Handbook, which included McPherson's policy expressly prohibiting sexual and all other forms of unlawful harassment.  Doe acknowledged receipt of these materials, and testified that he never asked McPherson any questions about them. Doe admits that he understood, *inter alia*, that if he had any complaint regarding harassment of any kind, he could and should report it to an supervisor and/or to the Director of Human Resources.

### Allegations of Purported Sexual Harassment

There was a culture of horseplay and off-color badgering in the all-male warehouse where Doe worked.  Not only would the language used by many employees shock a bishop in his robe, but it

would have been unpleasant and offensive to any person of tender sensibilities.   Doe himself regularly joked with his fellow employees, calling them demeaning names like "fathead".   Doe also joked around with Mike, his superior.   When Doe and Mike would have to climb on top of tanks, they would rock the tanks back-and-forth to scare each other.   Doe, like other employees, would spit his tobacco juice in the trash can in Mike's office.   Doe also "rag popped" Mike, as well as non-supervisory employees.   Informality, to the point of crudity, was a way of life.   Everybody got a dose of ugly talk, delivered casually and without apparent malice.

Doe says that in late 2004 or early 2005 this warehouse banter rose to an intolerable level.   By that time, Mike's and Painter's comments had, on some occasions, become name calling of a sexual nature.   According to Doe, in 2005, Mike first referred to him as a "faggot", and made similar comments almost every day up until 2007, when Doe finally complained to Anne Marie Chapman ("Chapman"), the Director of Human Resources.   Doe says that Mike's comments included: "come here, fag," "hey homo," "look who's here, d**k s**ker," and "why does your breath always smell like a**?" Doe says that on September 25 or 26, 2007, Mike said to him "all anybody has got to do is pull their pants down and, poof, there you are ready s**k their d**k", and "hurry, everybody get your pants up, here's [Doe], he'll start s**king your d**k."   According to Doe, Painter made similar comments.   Doe says that between February

and April 2005, Painter said to him, "Okay faggot.  Here's what I want you to do[,]."  Doe further alleges that on October 18, 2007, Painter said to him "What, is the battery dead on your butt plug going dead?" (grammatical error in original), and "I swear, that boy can't do nothing without something shoved up his a**."  Doe says that once when he asked Painter about a jar of peanut oil sitting on Painter's desk, Painter responded, "You know what this is, that's a nut and you've had several nuts in your mouth." Painter apparently had a quick and filthy, if childish, response to almost any question.  Doe alleges that Painter regularly and routinely used expressions like: "faggot," "queer," "homo," "d**k s**ker," "fairy," "a** breath," and "go behind the tank and do what [you] do to other men."  Painter never used the word "gay", the relatively innocuous word used by male homosexuals to describe themselves.  Such nasty talk, in and of itself, does not prove that the people who engage in it, and who aim it at others, actually believe, or have any reason to believe, that their listeners are actually homosexual or have homosexual propensities.  The expression "ass breath" has no homosexual connotation.  It sounds more like a comment on someone's halitosis.

Other McPherson employees, including Scott Wamble ("Wamble") and Eric Beasley ("Beasley"), testified that Mike and Painter regularly made these types of  comments **to each other**, and to others.  In other words, Doe was not the only person with whom this

word game was played.  Doe does not dispute this fact.  Instead, he demurs, simply saying that he does not know whether or not Mike and Painter made such comments to others.  He admits that it is possible.  Doe also admits that he did not feel physically threatened by any of the talk, and that no one at McPherson ever touched him or propositioned him.

Doe is 5'10" and weighs between 190 and 220 pounds.  He has tattoos on his arms.  He, as well as other male employees, wore earrings.  Doe was married and had children.  Doe did not carry himself like a woman or act in a manner that could even remotely be described as feminine.  Doe testified in his deposition that he was "just as much of a man as anyone else" and that he gave this impression to everyone, including his co-workers.  Mike and Tipton both testified that Doe did not look or carry himself in any way that would suggest femininity.  Doe even bragged about his way with women.  He gave no one any reason to doubt his manhood.  He did nothing and said nothing to suggest that he was homosexual.

**Doe's Complaints Regarding Alleged Harassment**

About a year into his employment, Doe told Tipton that the name calling wasn't appreciated, and that it needed to stop.  Doe also told Tipton that he wanted Mike and Painter to address him by his first name or "sir."  There is no testimony as to what particular words or expressions Doe found offensive, or violative of any particular federal discrimination laws.  By inference, all

of the above-quoted words offended Doe.  It was not, however, until
sometime in 2006 that Doe told his co-workers, Beasley and Merrell
Smith ("Smith"), that he was sick of their horseplay, that he could
not put up with it anymore, that it was driving him crazy, and that
he wanted it to stop.  Beasley and Smith both then apologized to
Doe, and stopped making off-color remarks in Doe's presence.
Before November 2007, Doe did not report any of this offensive
language to Chapman, the Director of Human Resources, because he
personally liked his fellow employees, and did not want to cause
them any trouble.  On some unspecified date, Doe told Mike that he
was tired of his comments and that they were getting old.

In 2007, Tipton finally told Doe to complain about the
offensive language to the Director of Human Resources.  During the
week of November 3, 2007, Doe spoke for the first time with Chapman
about Mike's and Painter's inappropriate language.  Doe may have
also talked to Chapman about what he had found to be offensive talk
by other employees, because Chapman followed up with others.  At
the conclusion of the conversation, Chapman told Doe that she would
investigate the matter.  Before the week of November 3, 2007, Doe
had never complained to Chapman about any bothersome workplace
horseplay, or language, not only because he did not want to hurt
anybody, but, as he testified, because he "loved his job."  In
short, between his first day of employment in 2004, and the week of
November 3, 2007, Doe never complained to the Director of Human

7

Resources about foul or sexually provocative language, despite the clear invitation to do so contained in the Employee Handbook.  On October 30 or 31, 2007, shortly before the week of November 3, 2007, Doe had consulted with Chapman regarding personal matters, but Doe admits that on the earlier occasion, he did not bring up any inappropriate or harassing language.[3]

Immediately after her meeting with Doe during the week of November 3, 2007, Chapman interviewed Painter, Mike, and Beasley regarding Doe's complaints.  She instructed all three to stop making inappropriate or vulgar remarks to, or in the presence of, Doe.  McPherson disciplined Mike and Painter for their offending language.  The discipline apparently worked, because Doe heard no more ugly remarks from any McPherson employee during the remainder of his employment.

**Other Events Prior to the Reduction in Force**

On February 7, 2007, Doe received his annual performance evaluation for the 2006 calendar year.  On a scale of one to four, with one being the worst and four being the best, Doe received an overall rating of two.  This was months before Doe met with Chapman

---

[3] In its brief, EEOC asserts that Doe talked to Chapman about the allegedly harassing comments during the October 30 or 31, 2007 meeting.  EEOC offers no evidentiary support for this assertion.  A thorough review of Doe's deposition reveals Doe's unequivocal testimony that he did not discuss these comments with Chapman until the meeting held during the week of November 3, 2007.  (*See* Doe Depo. at 277:2-10).

regarding personal issues.[4]  On October 30, 2007, Doe was randomly selected to take a drug test.[5]  He did not complain about it at the time.  Doe took the test on November 1, 2007, and passed it.  This was before Doe's second meeting with Chapman.  Other McPherson employees were also randomly drug tested the same week.  Doe had problems with his attendance.  His co-workers complained that he came to work late and kept "bankers [sic] hours."  On January 22, 2008, Chapman and Painter met with Doe about his attendance problem.  Immediately after this meeting, Doe received a disciplinary warning for failing to report to work without notifying anybody of his impending absence.  Chapman explained to Doe that McPherson was willing to accommodate him while he was going through a difficult time, but that he must let his supervisors know in advance if he was going to be late or absent.

---

[4] EEOC contends that anything related to the personal issues Doe was experiencing during 2007 is inadmissible as irrelevant. While the court finds it unnecessary to rehash the intimate details of Doe's personal life during 2007, the fact that Doe was experiencing personal issues to the extent that he discussed them with Chapman in late October, without discussing his work issues is relevant to his state of mind at the time, particularly as an indication of his own evaluation of the offending conduct.

[5] EEOC disputes that this drug test was random, like the others contemporaneously given, but offers no evidence in support of this contention.  This unsupported contention is insufficient to create a disputed fact sufficient to prevent the entry of summary judgment.  *See In re World Access, Inc.*, 310 F. Supp. 2d 1281, 1289 (N.D. Ga. 2004) (citing *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 1983)) ("Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact.").

EEOC contends that Doe was denied the benefit of McPherson's progressive discipline policy when he received this January 22 warning, but EEOC's said contention is conclusory in the extreme. EEOC does not offer any proof that some undescribed lesser discipline than a warning would have been called for if progressive discipline had been applied.

On February 6, 2008, Doe was forty-five minutes late. He did not notify anyone in advance that he was going to be late. On February 7, 2008, he did not appear at all, and did not notify McPherson that he would not be coming to work until forty-five minutes after he was scheduled to arrive. For a reason that is obvious, he received no discipline on these occasions. It had already been determined that Doe would be RIFed. There was no point in disciplining an employee on February 7, 2008, when a day later he would no longer be an employee. Whether Doe's non-appearance on February 7, 2008, was because he knew that he was being RIFed is not reflected in the record, but it would make sense.

At some unspecified earlier time, McPherson asked Doe to obtain a commercial driver's license ("CDL"). Doe never did obtain such a license, becoming the only employee in the Renew Department who did not have one.

Late in 2007, Smith and Wamble were assigned to handle an off-site job. Wamble was unable to go. Doe was assigned in his place.

10

EEOC cannot seriously offer this as an adverse employment action.

To the extent that any of the above-outlined events may have constituted adverse employment actions, they were not indicative of any bias and were entirely appropriate under the particular circumstances surrounding them.

**The Reduction in Force**

In late 2007 and early 2008, an Executive Management Team, consisting of Mike Bedford ("Bedford") (a different "Mike"), Vice-President of Operations, Brad Grey ("Grey"), and Ken McPherson ("Ken"), decided that McPherson must cut jobs to off-set a downturn in business.[6]  As a result, McPherson implemented a RIF in early

---

[6] EEOC disputes McPherson's account of the RIF process. EEOC's evidentiary citations, however, do not support its assertion.  EEOC contends that testimony offered by Bedford and Chapman is inconsistent as to who made the decision that Doe would be selected for the RIF.  Specifically, EEOC argues that Bedford testified that he made the decision, while Chapman testified that the Executive Management Team made the decision to discharge Doe.  Based on this alleged inconsistency, **EEOC resorts to a dispute of every fact** offered by McPherson related to the RIF, including facts unrelated to the process in which Doe was selected for discharge.  The court has taken EEOC's position as seriously as such a position can be taken.

Upon review of the testimony, the two accounts offered by Bedford and Chapman are **entirely consistent.**  Bedford testified that he made the decision to select Doe for the reduction in force and agreed that the other members of the Executive Committee and Chapman were involved in the RIF process.

As to his role in selecting Doe for the RIF, Bedford testified:
Q: Okay.  So is it your testimony that you made the decision for [Doe's] employment to end and not the team? . . .  Which one, did the team made the decision or did you make the decision?

_____

    A: As I've already stated, I made the decision.
    Q: Would that apply to all of the reductions in forces in 2008?
    A: To those departments that reported to me, yes.

(Bedford Depo., Doc. 104-7 at 74:10-22).  At another time, Bedford testified that:
    Q: What were the circumstances for you to meet [Doe]?
    A: [Doe] was an employee in the Renew Division and I
    was over Renew from the operations standpoint.

(Doc. 104-7 at 10:12-16).

Bedford's testimony unambiguously establishes that he made the final decision to terminate Doe, because Doe was selected from the Renew Department, a department he oversaw.  Bedford did not make the decisions regarding the termination of employees outside of his the departments he worked.  Other members of the Executive Committee were involved in the RIF process either by providing Bedford with information, such as budgetary needs, or making the final decisions for the departments they oversaw.  (*See generally*, Doc. 104-7 at 25:8-21; 41:4-8).

    Bedford's testimony regarding who selected Doe for the RIF is entirely consistent with Chapman's testimony.  Chapman testified:
    Q: Okay.  So would you agree that the four individuals
    who made the decisions as to who were to be subject to
    a reduction in force were you, Ken McPherson, Brad
    Grey, and Mike Bedford?
    A: Yes.

(Chapman Depo. 2, Doc. 104-12 at 16:7-11).  Chapman did not testify that each of these individuals was involved in the specific decision to select Doe for the RIF.  Instead, she testified that each of the members of the Executive Management Team were **involved the RIF decisions.**  Chapman later clarified by explaining her role in Doe's selection.
    Q: Were you involved in decision who was going to be
    subject to the reduction in force?
    A: Not all of them.
    . . .
    Q: Okay.  Were you involved in [Doe's]?
    A: Not as the final decision-maker.

(Doc. 104-12 at 13:4-11).

2008.  Because the Renew Department was not performing up to expectations, the Executive Management Team decided to cut one of its three employees, Smith, Wamble, and Doe.  Doe was finally selected as the one to go.  Overall, eleven McPherson employees were let go as part of the RIF.

McPherson explains, without any real need to do so, that Doe was selected for the Renew Department RIF for several reasons.  The core reason for letting him go was, of course, the mathematical certainty that during the RIF, hard choices like this one had to be made.  The court finds it hard to believe that EEOC is seriously arguing that the entire RIF process was a subterfuge and a fraud designed for the sole purpose of providing cover for retaliation against Doe. If that is EEOC's contention, it is so beyond belief as to be precluded from jury consideration.  Instead of undertaking the virtually impossible, namely, to prove that the RIF itself was a pretext, EEOC argues that the reasons McPherson gave for Doe's selection as the one to RIF in the Renew Department are unworthy of belief.  Basically, EEOC is insisting that McPherson had no

---

The testimony offered by EEOC in support of an alleged inconsistency plainly does not support its contention.  EEOC does not offer any other evidence to dispute the RIF decision-making.  Its only argument is that the testimony is inconsistent, which it plainly is not.  EEOC's manufactured inconsistency is not sufficient to create a genuine issue of material fact regarding McPherson's  RIF process, especially one that singled out Doe.  Which people actually participated in the decision is not crucial to the outcome.

legitimate reason for exercising what is a clear employer prerogative, namely, a RIF. EEOC cannot oppose the idea that good employees, like bad employees, are subject to RIF. An employer's RIF selection cannot itself create a Title VII claim by the RIFed employee, that is, unless the choice is so transparently tainted with prejudice that it smells to high Heaven. EEOC does not contend that Doe was more qualified than either of the two Renew Department employees who were retained. Absent the RIF, McPherson says that it would not have terminated Doe, despite his several shortcomings. Conspicuously, no one was hired to replace Doe. If, for economic reasons, McPherson decided to reduce its work force in the Renew Department by one, McPherson had to choose one. There is nothing in the record to suggest either that the decision to reduce force was aimed at Doe, or that Doe's selection was retaliatory or the result of any form of prejudice.

**Hostile Work Environment**[7]

Title VII clearly prohibits an employer from discriminating against an employee based on the employee's sex.  42 U.S.C. §

---

[7] McPherson is the only party that has moved for summary judgment on the hostile work environment claim.  For reasons of practicality and abbreviation, this court will not tie itself into a pretzel under Rule 56, trying to give both non-movants the benefit of the doubt on all possible conclusions that can reasonably be derived from the evidence.  Where there is arguably conflicting evidence, EEOC will be given the benefit of the doubt, although it is a movant on the retaliation claim.  Both parties rely on some of the same evidence, whether as movant or non-movant.

2000e-2(a).  It follows as night follows day that discrimination which creates a hostile work environment based on the sex of the complaining party violates Title VII.  In *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), the Supreme Court held:

> When the workplace is permeated with **discriminatory** intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment, Title VII is violated.

(emphasis added, internal citations and quotation marks omitted).

Under this rubric, EEOC must show:

> (1) that [Doe] belongs to a protected group; (2) that []he has been subject to unwelcome sexual harassment; (3) that the harassment was based on [his] sex; (4) that the harassment "was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive work environment"; and (5) a basis for holding the employer liable.

*Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1257 (11th Cir. 2003) (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).

In the case before the court, the question of whether McPherson allowed or encouraged an actionable hostile work environment boils down to this: "Was Doe singled out for mistreatment **because of his sex**?"  Just as in cases of opposite-gender sexual harassment, the plaintiff in a same-sex harassment case must prove not only that there was harassment but that it was, in fact, occasioned by the plaintiff's sex.  Such a plaintiff must show not only that the employer's conduct was offensive to her or

15

to him, but that it constituted discrimination because of her or his sex.  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78-79 (1998).  Establishing the discriminatory aspect of **same-sex** harassment is more difficult than establishing opposite-gender harassment.  There is no formula by which it can be established. In *Oncale*, the Supreme Court recognized three ways by which a plaintiff can prove that harassment by persons of the plaintiff's own sex is traceable to or occasioned by plaintiff's sex.  These include: (1) by  credible evidence that the harasser himself was homosexual; (2) by credible and clear evidence that the harasser was motivated by general hostility toward persons of the victim's gender working in the workplace; or (3) by direct comparative evidence that the alleged harasser treated men and women differently in the workplace.  *Id.* at 80-81; *see Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1068 (8th Cir. 2005)(recognizing that the three methods outlined in *Oncale* are non-exhaustive); *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999) (same). EEOC's claim of the same-sex harassment of Doe does not fall within any of the three methods of proof listed in *Oncale*.  For this reason, EEOC seeks an innovative recognition of a new Title VII concept, namely, that the discrimination element can be established by a showing that the male employee was harassed by members of his own sex because the male plaintiff did not conform to the male

16

stereotype.[8]  This court is, then, being asked by EEOC to expand the reach of Title VII to preclude offensive workplace language even when it is not directed at a person of the male sex because of that person's male sex.  The mere fact that Doe's fellow employees used terms like "faggot", assuming that their purpose was to irritate Doe or to irritate others who were also called "faggot", does not prove that Doe would not have been bothered by other demeaning terms such as "idiot" or "fool".  This particular workplace was not exactly a Sunday School.  Any person who is offended by filthy language, particularly if aimed at him, might well take offense at the language that offended Doe.  The alleged "harassers" may or may not have enjoyed getting under Doe's skin, but they undoubtedly did get under his skin.  If Doe had complained to the Director of Human Resources two years earlier, the offending conduct might have ended before it reached the stage that finally caused Doe to bring it to the attention of the Director of Human Resources.

---

[8] The theory of same-sex harassment based on gender stereotypes comes from the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S. Ct. 1775 (1989).  In *Price Waterhouse*, a plurality advocated that "[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." *Id.* at 251, 109 S. Ct. 1775 (internal citations and quotation marks omitted).  Because neither of the two concurring opinions in *Price Waterhouse* expressly disagreed with this plurality proposition, many courts have traveled on the assumption that the plurality opinion is the law of the land. This may or may not be good jurisprudence.

The undersigned judge well remembers a grizzled veteran drill sergeant during basic training.   What the sergeant called us draftees equaled or exceeded what Doe heard himself and others being called at McPherson.   The sergeant routinely called us "mother-fuckers" or "cock-suckers", when he wanted to emphasize a point or to get our attention, or he put the two expressions together.   He may have considered the language as a training technique, or he may just have been born with a foul mouth, but we did not understand that he believed that any of us fit either of the two pejorative appellations he routinely used to describe us to our faces, both of which, if taken literally, would have had provocative and offensive sexual connotations.   We called our sergeant "sir".   The context was different, but the analogy is good one.

The Eleventh Circuit has not addressed the gender stereotype theory in a Title VII case.[9]   In *Glenn v. Brumby*, **a case brought under 42 U.S.C. § 1983 and not under Title VII**, the Eleventh

_____

[9] Several circuit courts have recognized that a plaintiff may be able to establish a claim of same-sex harassment by showing that the harassing conduct was motivated by a belief that the plaintiff did not conform to the stereotypes associated with his or her sex. *See e.g., Dawson v. Bumble & Bumble*, 398 F.3d 211, 218-21 (2d Cir. 2005); *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 262-63 (3d Cir. 2001); *Nicholas v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 874-75 (9th Cir. 2001) *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261 n.4 (1st Cir. 1999); *Doe v. City of Belleville, Ill.*, 119 F.3d 563, 580-83 (7th Cir. 1998), *vacated on other grounds*, 523 U.S. 1001, 118 S. Ct. 1183.

Circuit held that when a defendant, while acting under color of
state law, discriminates on the basis of a person's nonconformity
to a gender stereotype, the conduct may constitute sex-based
discrimination in violation of the Equal Protection Clause.  663
F.3d 1312, 1316 (11th Cir. 2011).  The Eleventh Circuit relied upon
the plurality opinion in *Price Waterhouse*.  *Brumby*, like other
cases to be cited, is readily distinguishable from the present case
for a more obvious reason than that it is being brought under an
entirely different federal statute with different essential
elements.  *Brumby* involved a plaintiff who had an **obvious** gender
non-conformity, a fact that is not present in the instant case.  As
will be explained in more detail, this court does not believe that
the narrowly tailored stereotype theory of sex discrimination
recognized in *Brumby* can or should be judicially expanded to make
the conduct that EEOC here complains of on behalf of a masculine
male into a violation of Title VII.  It does not cross any bright
line that was drawn in *Brumby*.

Assuming *arguendo* that, if faced with the issue, the Eleventh
Circuit would recognize the applicability of EEOC's suggested
theory to a Title VII case, this court must determine if there is
evidence **in this case** upon which a reasonable jury could find that
Doe was harassed **because of his failure to conform to the male
stereotype** and therefore that he was harassed "**because of his sex**."
There are substantial differences between the evidence in the few

cases in which a court has recognized a claim for hostile work environment, and the undisputed evidence in the present case. The most critical difference is that in all of the previous stereotyping cases there was **undisputed evidence that the male target of the alleged harassing behavior clearly displayed effeminate characteristics**. The male plaintiffs in the said cases virtually advertised their non-conforming sexual image. *See e.g., Prowel v. Wise Business Forms, Inc.*, 579 F.3d 285 (3d Cir. 2009); *Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864 (9th Cir. 2001). Here, there is no evidence that Doe, the complaining party, failed to conform strictly to the male stereotype, or was thought not to do so. This court can find no decision, whether binding on this court or not, in which a demonstrably masculine plaintiff has prevailed. *Cf. Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 764 (6th Cir. 2006) ("Rather, his claim fails because Vickers has failed to allege that he did not conform to traditional gender stereotypes in any observable way at work.").

Trying to push Doe within the *Brumby* embrace, EEOC disagrees with Doe himself, and argues, in contradiction to Doe's own testimony, that Doe was harassed because he did not conform to the male stereotype. Where does EEOC find this? Certainly not from Doe. Doe's testimony belies and utterly destroys any such contention. Doe testified that he never thought of himself as acting in any way like a woman. Instead, he testified that he is

just as much of a man as any man.  He spit his tobacco juice with
the other men.  He looked in all respects like a man and acted like
one.  Contrary to the position taken on his behalf by EEOC, Doe
more than once testified that he gave off a manly impression.
Nobody ever called him effeminate or girl-like.  Doe's complaint is
quite different from the complaints in the few cases in which
courts have found Title VII harassment in response to plaintiff's
nonconformity to gender stereotype.  For example, the plaintiff in
*Prowel* readily conceded the obvious, namely, that he did not
display masculine traits.  579 F.3d at 291.  Prowel may not have
worn a dress and high heels, but he readily admitted that he spoke
in a high-pitched voice, walked in an effeminate manner, groomed
his nails, crossed his legs and had a tendency to shake his foot
the way a woman might.  *Id.*  In the instant case, it is undisputed
that Doe viewed himself as fully masculine.  No witness, **including
Doe**, has testified to the contrary.  In its zealous representation
of Doe, EEOC is mischaracterizing Doe's own testimony.  It is
engaging in wishful thinking, apparently in order to squeeze under
the *Brumby* umbrella.

As a further illustration that Doe's alleged "harassers" did
not view him as feminine or as having any feminine traits, Mike and
Painter both testified that they did not think of Doe as in any way
feminine.  The very idea came as a surprise to them.  Their
testimony corroborates Doe's view of himself.  It provides no basis

21

whatsoever for inferring that anyone McPherson perceived Doe as non-conforming to the male stereotype. What exactly constitutes a stereotypical male could, of course, be a matter for debate in some other case, but not in this one. No witness spotted a non-conformity to masculine stereotype in Doe.

Although some witnesses in this case admit that their language could have offended fellow workers, it never occurred to any of them that they were singling Doe out for ridicule because he was effeminate or believably homosexual. In the few cases in which actionable harassment based on a male's nonconformity to gender stereotype has been found, the undisputed evidence unequivocally established that the male "harassers" perceived the employee to show feminine characteristics. In *Prowel*, for instance, the harassers referred to the unmasculine Prowel as "Rosebud" and placed a pink tiara at his work station. *Prowel*, 579 F.3d at 291-92. Doe's alleged "harassers" have never described, much less commented on, Doe's body language, or the care he gave to his fingernails. In *Nichols*, the court explicitly noted that the "harassers" repeatedly reminded the complaining employee that he did not conform to the male stereotype. They referred to him as "she" and "her" and "the most vulgar name-calling . . . was cast in female terms." 256 F.3d at 874. No one at McPherson ever called Doe "she" or "her" or "sweetie pie".

In the instant case, while some of the allegedly harassing

comments had sexual connotations, courts have held that such gross language does not in of itself necessarily demonstrate that the language was occasioned by the plaintiff's gender. For example, in *Johnson v. Hondo, Inc.*, the court explained that "expressions such as 'f*** you,' 'kiss my a**,' and "s**k by d**k," are common place in certain circles, and more often than not when these expressions are used (particularly when uttered by men speaking to other men), their use has no connection whatsoever with the sexual acts to which they make reference." 125 F.3d 408, 412 (7th Cir. 1997); *see also Davis v. Costal Int'l Sec., Inc.*, 275 F.3d 1119 (D.C. Cir. 2002). While not binding authority, the cases cited above are on point and are highly persuasive. They represent a practical turn of mind as well as a correct reading of Title VII. Barracks humor is not amusing to every hearer, but its **mere use** does not make out a *prima facie* case of federally proscribed harassment.

As offensive as the language here complained of was, EEOC has offered no evidence to show that it was aimed exclusively at Doe, particularly by persons who believed that he did not conform to the male stereotype. It is undisputed that Mike and Painter made similar vulgar comments to other employees, **neither of whom were effeminate.** The court has already acknowledged that some people are more sensitive than others, but Title VII was not designed, and has not yet been construed, to protect the relatively few employees who are bothered by bad language of the sort employed here. Doe's

not complaining to the Director of Human Resources for two years after he first complained to fellow workers about their language is an undisputed fact.   This is entirely consistent with a differentiation in his own mind between vulgarity, on the one hand, and ridicule for perceived non-masculinity, on the other.

The court agrees with EEOC that Mike's and Painter's language crossed the line of social acceptability, even in an all male work environment.   But, this court is unwilling to assist in the creation of a general rule that will expose all employers to Title VII suits like this one.   EEOC asks the court to take Title VII into a brave new world.   The mission of EEOC is an important one, but it does not include the cleaning out of all boorish slobs in the workplace.   Bad facts sometimes make bad law, but it will require action by Congress to take Title VII over the great divide that now exists between bad language and same-sex harassment.   This court respectfully declines to act as the shoehorn to classify bad language as conduct proscribed by Title VII.

Last, but certainly not least, if Congress had intended in Title VII to prevent the use of foul and offensive language in the workplace, it would have had to find a way to circumvent the First Amendment.   A public policy against offensive language, if constitutional, would make the courts into word policemen.

**Retaliation**

Both EEOC and McPherson have sought summary judgment on the

separate retaliation claim.  EEOC seeks a judgment that McPherson unlawfully retaliated, contending that the undisputed evidence establishes a *prima facie* case of retaliation, and that McPherson's proffered reasons for discharging Doe are pretextual.  This court would have denied EEOC's motion for partial summary judgment as its first item of business if McPherson's interconnected Rule 56 motion had not been a priority item.  As defenses to EEOC's Rule 56 motion, McPherson predictably interposes three:  (1) that there is no causal connection between Doe's protected conduct and Doe's termination, (2) that McPherson had one or more legitimate, non-retaliatory reasons for terminating Doe, and (3) that EEOC cannot demonstrate that any of McPherson's proffered reasons were pretextual.

The court is puzzled as to why McPherson has confessed that Doe's complaint to Chapman constituted "protected" expression. There is a conspicuous lack of evidence as to exactly what Doe said to Chapman on or about November 3, 2007.  A Director of Human Resources fields many complaints that clearly are not expressions protected by Title VII.  A good Director of Human Resources listens to all workplace complaints of whatever variety.  Not many implicate Title VII.  Title VII only prohibits retaliation in response to an **objectively** arrived at employee complaint about past or present employer misconduct that **itself** constitutes a violation of Title VII.  McPherson concedes that whatever Doe said to Chapman

in their second conversation was said as part of a conclusion reasonably and objectively arrived at by Doe that McPherson had violated Title VII in the form of sexual harassment.  This court fails to understand McPherson's waiver of what seems to be a viable defense, but this court does not decide on litigants' strategies. Perhaps McPherson knows something about that conversation between Doe and Chapman that neither party has shared with the court. There is no evidence regarding the depth of Chapman's or Doe's understanding of Title VII, and, in particular, what proscribed "sexual harassment" consists of.  It is so likely to be true that the court deems that Doe shared with Chapman some of the offensive words used by others in the workplace.  No wonder she put a stop to it, but did she believe that Title VII had been violated?  If she did, she was, in this court's opinion, objectively mistaken.

Under the "opposition clause", an employee is protected from retaliatory adverse action if he has "opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).  A plaintiff engages in activity protected by the opposition clause when he opposes an employment practice that he has a good faith, reasonable basis to believe is unlawful. *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008). In order to satisfy this standard:

> A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief

26

> was *objectively* reasonable in light of the
> facts and record presented.  It thus is not
> enough for a plaintiff to allege that his
> belief in this regard was honest and bona
> fide; the allegations and record must also
> indicate that the belief, though perhaps
> mistaken, was objectively reasonable.

*Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960
(11th Cir. 1997).  (emphasis in original).  The opposition clause
is viewed in the context of what can reasonably be expected in an
ordinary business environment.  Accordingly, not every employee
complaint is given the protection that the "participation clause"
gives something like an employee's EEOC complaint.  *Anduze v. Fla.
Atl. Univ.*, 151 F. App'x 875, 878 (11th Cir. 2005).   Neither Doe
nor Chapman testified that "sexual harassment", whether
subjectively perceived by Doe, or objectively arrived at by both
conversationalists, was discussed at their meeting.   More
importantly, there is no evidence that Doe told Chapman that the
foul language was uttered for the purpose of humiliating him
because of his non-conformance to the male stereotype.  If he had
told Chapman these things, there would have been a plausible reason
for McPherson not to interpose the defense it was provided by the
opposition clause, **under which the burden of proof would have been
on EEOC.**

Without any opposition from McPherson, EEOC is free to ask the
court to assume with it that Doe held the reasonable and objective
belief on or about November 3, 2007, that he was expressing

opposition to an unlawful employment practice. *See Clover v. Total System Services, Inc.*, 176 F.3d 1346 (11th Cir. 1999).  By not raising the issue McPherson has conceded that Doe's complaint to Chapman was "protected" by the opposition clause.  **It has not conceded that the conduct complained of violated Title VII.**

McPherson draws its defensive line at another place, namely, at the issue of causation.  This is a good defense in this case. It is not the first defense this court would have chosen, but it gets the job done.  A *prima facie* case of Title VII retaliation requires evidence of causal connection.  The mere honestly held belief that protected expression and subsequent adverse employment action are connected is not enough.  McPherson admits that its disciplining of Doe on January 22, 2008, and its termination of Doe on February 8, 2008, were adverse employment actions, but it vehemently denies any connection between either of them and Doe's earlier conversation with Chapman.  If, and only if, EEOC has established a *prima facie* case, "the burden shifts to [McPherson] to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." *Id.* (quoting *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1196 (11th Cir. 1997)).

McPherson has articulated an over-arching and truly legitimate reason for Doe's termination, namely, a reduction-in-force.  EEOC has failed to show that this reason was a pretext. *Id.* (citing *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998)).

It is very difficult to make a jury issue out of pretext when the articulated reason for an employee's termination is a RIF that involves as many as eleven employees. EEOC has not offered any evidence of pretext that can overcome the RIF as its legitimate articulated reason.

The causal connection element of a retaliation claim requires plaintiff to prove that "the protected activity [here conceded by McPherson] and the negative employment action are not completely unrelated." *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1278 (11th Cir. 2008) (quoting *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998)). Causation may be inferred from close temporal proximity between the protected expression and the adverse employment action. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). When a significant amount of time has elapsed between the protected expression and the adverse action, a causal connection can exist **if and only if** the protected expression and the adverse action are **linked by a chain of intervening retaliatory acts**. *See Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998). Temporal proximity by itself must be "very close" in order to establish the causal connection. *Cooper Lighting, Inc.*, 506 F.3d at 1364 (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 121 S. Ct. 1508, 1511 (2001)). The Eleventh Circuit has held that as short as a two month gap between the statutorily protected expression and the adverse employment action

is not short enough to create a presumption of causation. *Williams v. Waste Mgmt., Inc.*, No. 10-13121, 2011 WL 207932, at *3 (11th Cir. Jan. 25, 2011) (affirming summary judgment based on lack of causal connection when there was a two month gap between the protected expression and the adverse employment action); *see also Cooper Lighting, Inc.*, 506 F.3d at 1364 (three month gap); *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (three and a half month gap); *Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004) (three month gap).

Over three months elapsed between Doe's conversation with Chapman and Doe's termination on February 8, 2008. This time lapse was so lengthy that it provides no basis upon which a jury could find the requisite causal connection, especially when McPherson's intervening verbal discipline of January 22, 2008, was very mild, was administered right after Doe's admittedly unexcused tardiness, and is not even complained of by EEOC. EEOC, for reasons of its own, does not charge that the discipline of January 22, 2008, was a violation of Title VII.[10]

EEOC, alternatively, argues that, despite the lack of temporal proximity, the necessary causal connection exists because Doe's

---

[10] The only statutorily protected activity alleged by EEOC is Doe's November 2007 complaints to Chapman. The only materially adverse employment action that the EEOC alleges is Doe's discharge on February 8, 2008. Using those dates, thirteen weeks elapsed between the events. McPherson's concession that the January 22, 2008 discipline was an adverse employment action did not shorten the gap.

meeting with Chapman was contemporaneous with or followed by a linked chain of retaliatory acts leading up to the termination. EEOC contends that there are four intervening events that create this chain: (1) a drug test, (2) unpaid time off, (3) a change in job duties, and (4) a failure to provide the benefits of progressive discipline. EEOC conspicuously leaves out the January 22, 2008 discipline as an "intervening event". The court finds EEOC's argument devoid of merit. This time line of "intervening events" establishes that all occurred **before** Doe orally complained to Chapman. Even if they had occurred after the conversation with Chapman, they would not supply the necessary links for EEOC's argument, because, neither separately nor severally do they carry any implication of retaliatory motive. They were appropriate exercises of business judgment, and are not conceivably indicative of retaliatory motive.

   A decision-maker cannot be motivated to retaliate by an event she did not know about, and could not have known about. *Brungart v. Bellsouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). To establish the causal links, EEOC must show that the decision-makers were aware of the protected conduct at the time each adverse action was taken. *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000), *abrogated on other grounds by*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). While there is no doubt that Doe met with Chapman on October 30 or

31, 2007, he did not on that occasion say anything to her about co-workers' allegedly offensive comments.   For some unexplained reason, he waited until the week of November 3, 2007, to complain. Any adverse employment action that took place before November 3, 2007, could not have been in retaliation.   Doe took the random drug test on November 1, 2007.   Doe accepted two days of unpaid leave shortly before the week of November 3, 2007.   EEOC offers no evidence to show proof that any change in job duties was before November 3, 2007, or was not routine.   Changing duties is not an adverse employment action unless it involves safety issues or is facially punitive and completely irrational.

Doe's disciplinary write-up on January 22, 2008, for his absenteeism, admittedly occurred after his last meeting with Chapman.   EEOC does not list this as a "link" or an adverse employment action, in all probability because Doe so clearly deserved it.   The "link up" theory cannot be stretched as far as EEOC wants to stretch it.[11]

Even if EEOC were found to have presented a *prima facie* case of retaliation, it has not provided any evidence that could reasonably lead a jury to conclude that McPherson's legitimate nondiscriminatory reason for Doe's termination, namely, the RIF,

---

[11] Doe received the January 22, 2008 discipline for failing to report to work without proper notification.   An employee's failure to report to work is a legitimate, non-retaliatory reason for an adverse employment action.   *See Gilchrist v. Bolger*, 733 F.2d 1551, 1553 (11th Cir. 1984).

was a pretext.  A RIF is always a legitimate reason for firing an employee, unless his selection during the RIF is a transparent, sham device to cover a proscribed reason for the entire RIF.  *See e.g.*, *Freytes-Torres v. City of Sanford*, 270 Fed. App'x 885, 894 (11th Cir. 2008).  When a total of eleven employees were RIFed, it would require proof of a conspiracy (in this case, a conspiracy involving at least four supervisory personnel) to meet the burden of proving a pretext.  An employer's decision to conduct a RIF is a well recognized and legitimate exercise of business judgment.  It is the result of economic conditions.  It cannot be scrutinized under the Title VII lens unless it is a facially elaborate fraud, without any business justification whatsoever.  This particular RIF, if it had been for the singular purpose of getting rid of Doe, would be such an irrational act as to cause the court to question not only the judgment and integrity of the four persons who participated in it, but in their sanity.  This particular RIF reasonably focused on several specific McPherson departments, including the Renew Department.  McPherson says that its choice of Doe was based on the relative skills and performance records of the three employees in the Renew Department.  Neither Smith nor Wamble had attendance problems.  Both had a CDL.  There was nothing about the choice of Doe that can call into question the entire RIF process.

Because the RIF was inherently and indisputably a legitimate,

non-retaliatory reason for eliminating Doe's position, EEOC wants to divert the court's attention to an entirely separate and tangential Title VII analysis. It contends that the reasons given by McPherson for choosing Doe instead of Smith or Wamble are not credible and thus are pretextual. McPherson's reasons for choosing Doe need not meet the standards for a straight-out firing of an employee, when the firing is not part of a RIF. McPherson's proffered reasons for choosing Doe are **only incidental to the RIF itself**. If EEOC is claiming that Doe's termination was a Title VII violation because the reasons given for picking Doe from among its three choices are all pretextual, it is barking up the wrong tree. Not only are the articulated reasons for picking Doe subordinate to the RIF, but they have no features that could remotely suggest a proscribed motivation for picking Doe. A good reason for picking Doe (if McPherson needed one), would be Doe's unexcused absence immediately before he was RIFed. McPherson did not articulate this as a reason, because the decision had already been made when Doe failed to show up for work on February 7, 2008.

EEOC has offered no evidence, either "direct" or "circumstantial", upon which a jury would find that McPherson decided to RIF eleven people just to get rid of an employee who had complained of offensive language to the Director of Human Resources several months before the RIF. To show pretext, EEOC "must cast sufficient doubt on [McPherson's] proffered nondiscriminatory

reasons to permit a reasonable factfinder to conclude that [McPherson's] proffered legitimate reasons were not what actually motivated its conduct." *Brown v. Chertoff*, 563 F. Supp. 2d 1372, 1378 (S.D. Ga. 2008) (quoting *Combs v. Plantation Patters*, 106 F.3d 1519, 1538 (11th Cir. 1997)). EEOC has not come close to accomplishing this not inconsiderable task. Neither has it come close to proving that the choice of Doe for the single Renew Department termination under the RIF can be traced to his "protected" complaint to Chapman. McPherson could easily have drawn straws between the three Renew Department employees, but it was not obligated to do so. People get hurt in a RIF. No reasonable jury could find pretext on this evidence.

**CONCLUSION**

Because there is no proof of discrimination by McPherson motivated by Doe's male sex, and no proof of retaliation, EEOC's motion for partial summary judgment will be denied, and McPherson's motion for summary judgment will be granted.

A separate order will be entered effectuating this opinion.

DONE this 14th day of November, 2012.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE